[Crim. No. 2734.   Third Dist.   Jan. 16, 1958.]

THE PEOPLE, Respondent, v. EARL LEIGHTON WILSON, Appellant.

John C. Bartlett and John A. Montgomery, Jr., for Appellant.

Edmund G. Brown, Attorney General, G. A. Strader, Deputy Attorney General, and Scott K. Carter, District Attorney (Tuolumne), for Respondent.

VAN DYKE, P. J.—The grand jury of Tuolumne County indicted appellant, charging that he committed the crime of voluntary manslaughter in that he did wilfully, unlawfully, feloniously and without malice kill one William Rudy Vonn. Upon his plea of not guilty, the matter was tried to a jury which returned a verdict of guilty as charged. A motion for a new trial was made and denied. Probation was likewise denied and the appellant was sentenced to imprisonment for the term prescribed by law.

At the time of the alleged homicide appellant was tending bar in an establishment known as "The Cliff House" in Tuolumne County. Appellant's wife had entered the barroom and seated herself at the bar when Vonn entered. It was about 12:30 a. m. He sat at the bar, consumed several drinks, and talked with Mrs. Wilson. After spending about an

hour in this way, Vonn was seen to lean or move toward Mrs. Wilson, take hold of her arms and address her. She was heard to protest. Appellant was at the time seated behind the bar talking to two men patrons. Upon hearing his wife's protest and observing the conduct of Vonn, appellant left his seat, went down behind the bar to the open end and around in front where Vonn and his wife were standing. He told Vonn to leave. Vonn left the barroom, attended by appellant. Immediately, and outside the barroom, an altercation occurred between the two men. Appellant said he struck Vonn with his fist after Vonn had first hit him and his theory was that Vonn's death was caused, not by the blow he struck Vonn, but by Vonn's later falling out of his truck and striking his head on the road surface. The state contended Vonn's death was caused by a blow from a blackjack in the hands of appellant.

The barroom may be described as follows: The building faces easterly on the highway. The front entrance is a double door. As one enters, the bar is immediately to the right with stools arranged in front. At its easterly end it makes a right angle turn north and there are several stools along that portion. The usual back bar and equipment is just north of the bar, leaving room between it and the bar for the bartender to work.

At the time with which we are concerned it was after midnight and there were several persons in the bar. Seated around the bend of the bar were Mr. Peterson and Mr. Stockman. They were talking to appellant who was seated just inside the bar across from them. Peterson and Stockman had a view down the area between the front and back bar and over the bar along the front of it. Patricia Orr, a waitress off duty, was seated several stools down from the bend in the bar. Near the west end of the bar, Vonn was seated and beyond him was Mrs. Wilson.

The first witness called in behalf of the People was Mrs. Wilson. She testified, in substance, as follows: I am the licensee at The Cliff House. At the time Mr. Vonn was there I wasn't working. Sometimes I tend bar. That night I was just sitting there. Mr. Vonn came in around 12:30. He ordered a drink and sat down. I was seated two stools from the west end of the bar. Mr. Vonn sat on one stool near me and I talked to him. He was quiet, appeared to be sober, and behaved like a gentleman. After a while he got off his stool and sort of lunged at me. He put his hands on my arms and

turned me around with my back to the bar and held me there. I tried to get away and as soon as I saw I couldn't I made some sort of noise. My husband turned around and then came around from behind the bar. He walked up to Mr. Vonn and told him to leave. When he took Mr. Vonn by the elbow, Mr. Vonn dropped my arms. Mr. Vonn and my husband walked to the door. Mr. Vonn seemed sort of dazed. My husband took him by the arm and they went out. There were no blows or scuffling inside the building. I saw no exchange of blows outside.

Mr. Stockman, called by the prosecution, testified as follows: I went with Mr. Peterson around 11 p. m. to the Cliff House bar on the evening of the trouble with Mr. Vonn. Mr. Vonn was then seated at the bar at the far end. He was talking to Mrs. Wilson. I was sitting at the end of the bar facing toward them. I saw Mr. Vonn with his arm over Mrs. Wilson's shoulder and leaning towards her. I didn't know whether he was making a pass or just talking until she hollered. He took his arm down. Mrs. Wilson jumped up and they talked back and forth. I couldn't hear what they said. Mr. Wilson waited a few seconds and went down there. He didn't rush. He waited between 15 and 45 seconds. When he got to where Vonn was seated he told Vonn to get the hell out. He did not raise his voice too awfully much. Mrs. Wilson said, "and stay out." Mr. Vonn got up and said, "I'm going." He didn't act mad, but fairly calm. He appeared to be sober. I assume he had had a few drinks. Mr. and Mrs. Wilson followed him out. Mr. Vonn didn't protest his right to stay. They were all three practically together a matter of four or five feet between them, Vonn going first and then Mr. and Mrs. Wilson. Mr. Peterson had gone out and he came back in and said: "There's been a fight," or "some trouble," and we walked out. When I got outside I saw Mr. Vonn leaning against the bumper of Peterson's car. He was in an unconscious condition. Mr. Wilson was packing water from across the road from a little spring. He threw several handsful on Mr. Vonn's face. Mr. Vonn did not recover consciousness. Wilson said: "He hit me on the ear and I hung one on him." His ear was a little red but not cut. There were no bruises on his face. Peterson picked Vonn up and put him in a chair. He sat and leaned back in it. He seemed unconscious. Peterson and Mr. Wilson felt his pulse. Peterson kind of glanced over his head to see if there were any bumps or cuts. He figured maybe he had hit his head on the bumper

but he said he saw nothing. Mr. Wilson said his pulse seemed good, so we went back in the bar and finished our drink. Vonn was still seated outside. His breathing seemed to be normal. He didn't seem to be in too much misery, he wasn't groaning or frothing at the mouth or anything like that. When I went outside I saw a little mark on Mr. Vonn's face underneath his cheek bone—a little grained spot where he had been hit with a fist. If Mr. Vonn's breathing had not been all right, or if he had seemed to be in any pain I probably would have called an ambulance or doctor. He seemed like one who had had too much to drink and was sleeping it off.

Ralph Ogden, a witness for the People, testified, in substance, as follows: I do maintenance work and a little of everything around the Cliff House. Between 5:30 and 6 o'clock on the morning after the Vonn incident, I went down to the Cliff House to start things going. I saw a fellow lying on the pavement in front of the place. He was either asleep or unconscious. I went and started the coffee and came out again. He had begun to move around a little so I thought I'd better get somebody and we would get him up on the porch. Somebody came along and we lifted him up and put him on a bench on the porch. Later on I called Mr. Wilson to come down. I told him there was a man down there and something was wrong with him. He asked me who it was. I told him I didn't know and he said he had trouble with the man last night. In a few minutes he came down.

Jess D. Milligan, for the prosecution, testified as follows: I have been employed by Earl Wilson. I was a chef and sometimes tended bar if needed. The next morning after Mr. Vonn was hurt I went down to the lodge about 6 o'clock. When I got there Mr. Vonn was lying on the divan on the front porch. After a while Mr. Wilson came down. Mr. Vonn was unconscious. When Mr. Wilson got down I asked him if he knew the man and he said, "No, I don't." I said, "Well, he is pretty badly hurt." I told Mr. Wilson the only thing I saw wrong with him was his upper lip was swollen and Mr. Wilson said: "That's where I hit him." I said: "Where you hit him?" He said, "Yes." I said: "Earl Wilson I wouldn't say I did it." He said: "I did it and I'm not ashamed I hit him. He made a pass at my wife, and I knocked hell out of him." Mr. Wilson went back in the lodge. The only thing I seen wrong with Mr. Vonn was a bruised lip. His lip was swollen, but there wasn't no cut place that I see.

I saw no mark on his face. The only visible sign of injury about Vonn's face that I saw was his upper lip was swollen. There was no cut marks that I could see anywhere.

Dr. Phillip Lamb, called as a witness for the People, testified as follows: On June 13, 1955, I had William R. Vonn as a patient. The man was obviously suffering from some serious condition resulting from something in his head. I first thought it was disease rather than injury because there was nothing really noticeable in the way of external injuries that would coincide with this severity. A further examination and a spinal puncture showed the gross blood in his spinal fluid. Quite obviously he had had a hemorrhage inside the skull; I assumed a ruptured blood vessel, in other words, a very severe form of stroke. It wasn't until later I found the man had an injury and that his condition was quite poor. There was nothing to indicate the location of where his bleeding was other than it was generalized. It wasn't until the following day that the symptoms showed where he seemed to have most of his pressure. I consulted with a neurosurgeon in San Francisco and he advised going in immediately, although he felt from the description of the symptoms that it was more or less a hopeless affair. On opening his head on the right side, a small fracture was found and then going further in a very large amount of blood clots were found and removed. It could be seen that the brain tissue was quite badly torn. There was nothing that could be done about that. His condition gradually became worse until he died. Subsequently, an autopsy was performed and his head was opened. The only damage that we found to the skull itself was a small linear fracture about 2 inches long, a hairline crack on the right temporal side of the head. There was a bruise over his left cheek bone. The brain tissue was torn. There were hemorrhages in the brain. No further fractures were discovered, but there was about an equal amount of damage from the tearing of the tissue on the left side as well as on the right. I removed the brain intact and sent it to a pathologist for further examination. I've never seen this much damage to a brain without more external evidence of injury and for that reason the only supposition I can draw is that the man's brain just bounced around inside his skull more than usual to result in that much damage. There would have to be some force causing the brain to so react. Normally one would say it would have to be a great force, yet cases have occurred apparently with a minor injury where with minor force severe

injury has been caused. The damage was extensive. The hemorrhaging was severe. Mr. Vonn was unconscious up to the time he died. A blow would be required to cause the fracture on the right side of the skull. I couldn't say that the linear fracture of the skull was caused by a blackjack or might have been because I have never examined any blackjack injuries. When I performed the autopsy I found no other evidence of blows or beating than the ones I have described. From the brain damage I found I would not expect it to result from a blow by a fist. In every case I have seen with a fracture of the skull resulting in serious injury there was always a considerable amount of external injury. A blow with or against a flat surface would be less likely to leave external injury than a blow from a sharp instrument. All the injuries about the head and bruise marks that I found were recent. I don't believe any of the marks I saw had anything to do with Mr. Vonn's death. When I first saw Mr. Vonn the idea of injury didn't occur to me. What outward signs of physical injury there were, were so slight that it didn't even occur to me that he had been struck about the head. It is quite unlikely that Mr. Vonn would have been able to walk after he incurred the injuries I found in the brain. Assuming that at a quarter to two in the morning the defendant Earl Wilson struck the decedent and knocked him down and he then became unconscious and was subsequently placed in a chair where he snored, seemed to be normal, pulse seemed to be normal and that about an hour thereafter he was awakened or shaken and said something to the effect, ''Well, I will go,'' and that he was then able to assist himself in getting up and going and getting in his car or to assist Mr. Wilson in getting him up and getting him in his car, and having in mind the amount of damage to his brain that I found, it would be my opinion that it was more likely the injuries I found were suffered sometime after he was placed in his car. It not only can but does happen that a man has died from a brain injury without any external signs of blows after falling downstairs and without any external injuries. The skull fracture I found was not significant so far as the cause of death is concerned. The fracture did not cause the brain damage. It was a very minute linear fracture of no great significance. So far as the cause of death is concerned, the fracture could have occurred from a single forceful blow such as a fall. The fracture could have been caused from a heavy fall, striking the left side of the face on a pavement. As to a heavy blow on the left side of the face, causing a fracture on the other side, when a skull

is struck it can cause a fracture opposite to where the original blow was struck and if the blow was sufficiently hard to cause a fracture on the opposite side of the skull there would probably be a great deal of damage to the brain. The fracture on the right side showing no skin damage could have been caused by a blackjack. That is as likely as a fall if he was struck quite hard. If a man did fall down on a rough pavement with such force as to cause a skull fracture I think it is likely there would be a tearing of the skin and I found none. If he fell straight down there would not be much skinned area.

Dr. Harry J. Schneider, called as a witness for the People, testified as follows: I am a physician and surgeon and I specialize in pathology which includes the effects of trauma. I received for examination the brain of a decedent named William R. Vonn. The specimen was in a jar. It was only the brain. I couldn't determine the cause of death only from the brain because I didn't do the autopsy. I can explain what I found in the brain. On the right side of the brain there was a tear, an actual tear in the tissue, which is called a laceration. There was one that was five centimeters, about 2 inches, which would make it a 2-inch long laceration which extended along the inferior portion of the temporal lobe and extended onto the frontal lobe. There was one three centimeters, a little more than an inch, in length, and an inch deep. There was no evidence of a hemorrhage inside the brain. There was no evidence of prior disease in the brain. This was a traumatic thing. One wound can be the site of the application of the force or the head hitting some object and injuring the other side; a contra-coup injury which often happens in the brain. When the brain is in motion and is suddenly stopped or an object in motion hits the head the brain is jarred and moves and if the force is applied or the head hits back here the brain will go forward and the brain can be torn here. On the body you may find just a contusion beneath the skin in this area. There may not be a fracture and it is quite frequent that the damage to the brain is greater at the opposite end of the brain than at the side where the trauma is seen on the scalp. A fracture is usually caused by a blow or a fall. The force has to be either the head hitting a stationary object or an object in motion hitting the head. The damage to the brain is caused by the amount of motion that is produced to the head and how quick the brain stops inside. If Mr. Vonn had no skin damage in the area adjacent to the linear fracture I could give an opinion that either he

was struck with some force with an object or that he landed against an object, that is, he was either struck or he fell. If a fracture was produced at the site of the blow by a fist then certainly the knuckles should be broken or abraded or something should happen to the hand of the individual and it would have to be a mighty individual to fracture a very tough temporal bone. This is a very strong bone even though it is thinner than the major portions of the skull. On the other hand, if the blow was struck and the individual fell, the fracture could occur from hitting an object. If a man fell out of an automobile onto a pavement or blacktop surface, brain injury could occur when the rapidly moving head suddenly stopped. The blow here which caused the damage to the brain could have fractured the skull on the opposite side. The blow which produced the bruise under the left cheek bone could not have caused a fracture in the right temporal region. In my opinion the linear fracture on the right temporal area on the head of decedent Vonn could have been caused by a blackjack. The fact that there were no visible marks on the skin would indicate a weapon such as a blackjack could be used. The weapon would be somewhat softened by the covering over the metal inside the blackjack. The covering over the blackjack prevents any skin damage. If the blackjack was covered with wool and leather a quarter of an inch thick, resulting in a rough surface, you would be likely to find a cut or abrasion where the blow struck.

The appellant took the stand in his own behalf. He testified as follows: I am not a licensee on the liquor license at the Cliff House. The licensees are my wife, June Wilson, my sister-in-law Joan Donahue, and Hilda Ebner. I was working there on Sunday, June 12, 1955. During all the time I or my wife had anything to do with the Cliff House business, there has never been a blackjack or sap behind the bar and I've never seen one in the establishment. I know what a blackjack looks like. On June 12th I had been tending bar all evening. I recall that William Vonn entered the premises late that evening. When he came into the door he seemed to be alright. He sat down at the bar about two-thirds the way down and had a coffee royal. He was sitting on a stool or two away from my wife and they were talking. Pat Orr was sitting five or six stools further up the bar towards the front door. I couldn't say how many drinks Mr. Vonn had, maybe four. While I was sitting at the far end of the bar talking to Stockman and Peterson I heard my wife let out a yell. I turned around and Vonn had her kind of pinned up

against the bar. I jumped off my stool and went tearing down behind the bar. She hollered: "Earl," or something, she had fear in her voice. I turned when she called and saw that Vonn had my wife up against the bar with her back to the bar. Vonn had hold of her. I told him to get the heck out of there. I might have used a little profanity, I probably said, "Get the hell out of here." I moved immediately. When I started down there Mr. Vonn let go of her and stood there and looked kind of dazed in a way for a moment or two. He had let her go when I got there. He started out the door. He got half way and turned around. I said: "Go on, get out of here." I followed him out to make sure he got out. When we were outside the door I said, "Get in the God damned truck" and "get out of there." I told him I didn't want him, he wasn't welcome. He stepped down on the little sidewalk off the porch. I turned around and started to walk back in the bar. Then he hit me on, the side of the head. My back was half turned away from him. I turned around and started to square off. I figure I was going to get one back. We scuffled a little bit. I grabbed hold of him. He backed up, I advanced, I hit him right by the nose on the left cheek with my fist. I had nothing in my hand. He sat right down on his seat. He fell neither forward nor backward, just sat down as if his feet came out from underneath him. I went over and got some water across the street. I carried it in my cupped up hands. I threw it at him. He was still seated. He leaned against a fender of the next car. Stockman came out. I said to him: "Let's get the guy out and sit him on the porch." Miss Orr came out. Peterson came out. Stockman and I and another man got him up on his feet and walked him over to the chair, one on each side. I asked one of the men to get me a bucket of water. I doused his head with water and his wrists and he was kind of mumbling and grumbling around. He seemed to come out of it slightly but didn't say anything that I recall. I checked his pulse. It was perfectly normal. Then we went back inside. It was almost 2 o'clock and I got ready to close the bar. Vonn was still in the chair when Stockman and Peterson left. About 2:45 I closed up the bar. Mrs. Wilson was with me. I walked her up to the cabin about 150 yards away. Vonn was still there in the chair. Up at our cabin we were talking about Vonn and my wife said he might try to drive. She suggested I go down to see if the keys were in the truck and

if they were to put them on the floor in his truck. I went back and got him on his feet. He mumbled: "I'm going. Never mind. I'm leaving." He walked from the chair to his pick-up door. I was assisting him. I had my arm around him. It was about 8 feet from the chair to the pick-up door. I opened the door and succeeded in getting Mr. Vonn into the truck onto the seat. He was sitting behind the wheel, then he slumped over on his side, kind of twisted like and his feet came out and I couldn't close the door. I left him there in that position. I figured, "Well, he can sleep it off. I hope he don't wake up and try to drive." When I left him he was snoring. He snored like a man who was sleeping off a drunk.

Appellant was charged with voluntary manslaughter, defined by section 192 of the Penal Code as the unlawful killing of a human being without malice "upon a sudden quarrel or heat of passion." The Supreme Court in *People v. Bender,* 27 Cal.2d 164, 181 [163 P.2d 8], said that voluntary manslaughter is "a wilful act . . . characterized by the presence of an intent to kill engendered by sufficient provocation and the absence of premeditation, deliberation, and (by presumption of law) malice aforethought." It was the consistent theory of the prosecution, beginning when the grand jury returned its indictment of voluntary manslaughter and continuing throughout the trial including the arguments to the jury, that Vonn did not come to his death by a blow or blows from appellant's fist, but on the contrary that some type of bludgeon or blackjack was used by appellant with the intent to kill. Apparently, the prosecution considered the incident at the bar, when Vonn in some way, by his actions toward her, caused appellant's wife to call out, furnished sufficient provocation to reduce the killing to voluntary manslaughter. In his opening statement, Mr. William Bennett, counsel for the state, told the jury that the state's evidence would so demonstrate the extent of the injuries inflicted upon Vonn that the prosecution would ask the jury to believe that Vonn wasn't struck with a fist but was struck with something more and that this theory would be developed throughout the trial; that expert testimony entitled to great weight would show that the skull fracture, brain hemorrhages and other injuries sustained by Vonn were caused by blows administered by great force and that if the jury chose to believe that appellant possessed such striking power in his right hand as to do all of that with one blow they would be naive. In his opening

argument to the jury the prosecutor said: "There is an ugly word in this case and it's blackjack, and let's recall how that came into the case. You will recall that during the testimony of one of the witnesses, and I think it was Doctor Schneider, I asked him whether or not a blackjack could cause this injury, and there was great objection, and we were told the state couldn't prove the existence of the blackjack . . . We put on Mr. McCauley . . . He was there four or five years ago. . . . You recall Mr McCauley's testimony about Mr Wilson chasing Domingo out of the place playfully with a blackjack? . . . They did have a blackjack on the place four or five years ago. . . . We even have Mr. McCauley describing the blackjack. . . . He said it was brownish or reddish. . . . It did show you that when the defendant said, in this court room that he never, at any time, had a blackjack, there was a witness who disagreed with him, Mr. McCauley. . . . We have Jess Milligan telling us in no uncertain terms . . . there was a blackjack, and he saw it, and he told us it was kept under the bar and on top of the beer cooler. . . . He said it was reddish or brownish, and that is what Mr. McCauley said. . . . We had Mr. Johnstad . . . who said that he was in Mr Wilson's place when Wilson bragged to him that he wasn't afraid of trouble because he had a persuader, and I think all of you know what a persuader is. . . . We then had Mr. Lemos. . . . He went behind the bar, and what did he see? . . . Mr. Lemos saw a blackjack, and he described its color. He said it was about the color of the board at the head of the jury box . . . and I would say that is reddish brown. . . . We had Cecil Bell . . . who said no, he didn't see a blackjack, but he saw a heavy broom handle. . . . We cross examined him. He repeated, . . . , that there was a heavy broom handle there, so if it wasn't a blackjack, we had a heavy broom handle. . . . We had Miss Patricia Orr . . . she was a hostile witness to me. . . . I requested the permission of the court to impeach her, and I did so. . . . She did admit she had an interview with a special agent, and she did admit that she had seen a blackjack at the Cliff House while she was working there in 1955, and she did admit that was May, 1955 . . . and . . . she went so far as to make a drawing of the blackjack she saw— a typical blackjack. . . . I ask you to bear in mind this drawing of this blackjack . . . and I state to you in my opinion this is what caused the injury to the brain of William R. Vonn. This is what was the cause of his death. Now, you

may think that is not likely. Look at the defendant. What do you think could cause bone to shatter—the human fist? Well, don't take my word for it. Take the word of Doctor Schneider. What did he tell us about that little incident? I asked 'Could I strike somebody with enough force to shatter a skull?' 'Yes, you could Mr. Bennett, but if you did, force creates equal and opposite force. If you broke the skull, you would break the fist.' The defendant has no broken hand. He never did have. He physically could not have caused this linear fracture with his fist. What does that leave? Some other object. . . . Again that leads us to one conclusion, an object and a weapon. If you want to take the heavy broom handle, go ahead, but I suggest it's more likely you take the blackjack.'' Without quoting further, it can be said that throughout the trial the prosecutor sought to convince the jury that (1) it was not a blow from the fist of appellant that injured Vonn and caused his death; (2) it was not a fall from Vonn's pick-up truck where appellant said he had assisted him to mount, but (3) it was a blow struck by appellant with a blackjack with intent to kill. The same thread runs through the closing argument; for instance, the prosecutor said: ''Why didn't they call Pat Orr? Because she had seen a blackjack, and she admitted it to Mr. McVarish.''

It should be noted here that though it was the prosecution's contention throughout that appellant had hit Vonn with a blackjack, though several witnesses had been called to testify to having seen a blackjack or some other type of bludgeon in the barroom at various times, and though the state had called two eye witnesses, Mrs. Wilson and Mr. Stockman, neither had been asked if appellant had taken a blackjack with him as he left the barroom with Vonn. Notable also is the fact that the prosecution had not even called another eye witness, Patricia Orr, who had sat where appellant passed at arm's length as he went down toward Vonn. All three of these people had been so situated that they should have seen a blackjack if appellant took one out with him. Stockman and Mrs. Wilson were then called by appellant and both testified they had seen no blackjack or other weapon in the possession of appellant. Mrs. Wilson's testimony may have been biased, but not Stockman's testimony. It is hard to suppose appellant could have picked up such a weapon without Stockman seeing it. Other witnesses were called who had been around the barroom a long time and who said they had never seen a blackjack

or any such weapon around. One was a janitor who daily cleaned out behind the bar.

After the defense rested, Patricia Orr was called by the state as part of its case in rebuttal. The following occurred:

"Q. Now did you ever see a blackjack in the bar area? A. I don't recall having seen anything I could specifically identify as one, no.

"Q. It is your testimony that you never saw a blackjack?

" . . . . . . . . . . . .

"A. I said that I did not see anything I could specifically identify as a blackjack.

"MR. BENNETT: I would like to—your honor, the testimony of the witness is such that I would request the opportunity to impeach the witness.

"THE COURT: On what grounds?

"MR. BARTLETT: He has laid no foundation for surprise.

"MR. BENNETT: I am not an actor. I don't think I have to collapse in the court room to act surprised. Let me state I am surprised, and asked permission to impeach the witness.

"MR. BARTLETT: You called her as your own witness.

" . . . . . . . . . . . .

"THE COURT: . . . Counsel, the people, at this time, state to the court that this witness has taken him by surprise in the answer which was given to the question just propounded.

"MR. BENNETT: That is correct.

"THE COURT: Very well."

Mr. Bennett was then permitted to impeach Miss Orr. In response to questions she stated that she was questioned by a Mr. Martino, an investigator from the attorney general's office and that a Mr. McVarish, another investigator, was also present; that she told the investigators that she had a vague recollection that she saw something resembling a blackjack; that she drew a picture of what she saw (this drawing was received in evidence); that she may have seen it some place else; that if she did see what she drew she last saw it in May, 1955. She then gave her impression of the incident in the bar. She testified, on cross-examination by defense counsel, she saw no blackjack in appellant's hand as he left with Vonn.

Mr. McVarish was then called by the state. He testified that he was interviewing Miss Orr about the murder of Mr. Vonn. At this point the following occurred:

"MR. BARTLETT: I move the answer be stricken and the witness be admonished not to use inflammatory statements.

He is a clever witness who puts words in other people's mouth. The entire testimony is not proper rebuttal. There was no evidence in our case that called for this rebuttal.

"MR. BENNETT: Obviously Miss Orr was not the most friendly witness to the prosecution.

"THE COURT: I was assuming this was the purpose, impeachment of Miss Orr.

"MR. BENNETT: That is correct.

"MR. BARTLETT: Object that there was no proper showing made. He said she wasn't a friendly witness. Why should he be surprised? Counsel has deliberately built up a straw man, and I think it is highly prejudicial to the defendant.

"THE COURT: The courts always take a statement from members of the bar as to whether there is surprise. I would do the same whether it were you, Mr. Carkeet, or any other counsel."

The examination of Mr. McVarish then continued and he testified as follows: She said to me that normally there was a blackjack behind the bar; that it was usually kept on top of the beer coolers or on a shelf underneath the bar; she described it as being 8 inches long, brownish, leather-covered, as having a strap for a handle and a head that was covered with leather. She said that she saw it constantly in the bar, including the night prior to the eviction of Vonn from the bar, but that she had never seen it again; she drew a picture of a blackjack, the one in evidence.

Appellant contends that it was error for the court to permit the prosecution to impeach Miss Orr, and so get before the jury the damaging hearsay testimony of McVarish. ■ In order to impeach a party's own witness three things must be shown: Surprise at the party's present testimony, damage to the party calling the witness, and materiality of the evidence. (*People* v. *Spinosa*, 115 Cal.App.2d 659 [252 P.2d 409].) Objection to the impeachment was made on the ground that there was no showing of surprise. ■ The only proper and legal procedure when a party calling a witness is surprised by his testimony is to ask leave to cross-examine or impeach the witness. If opposing counsel disputes the alleged surprise, thereby raising an incidental or collateral issue, it must be disposed of by the trial judge. ■ The party who produces a witness may not merely claim surprise and thereupon cross-examine or impeach the witness. Where the surprise is disputed it is incumbent that the party seeking to impeach the witness show the basis of the surprise he

claims unless the surprise is obvious. (*People* v. *Flores*, 37 Cal.App.2d 282 [99 P.2d 326] ; *People* v. *Hines*, 128 Cal.App. 2d 421 [275 P.2d 585].) ▇ The trial court may not, as was done here, merely take the word of counsel that surprise existed. ▇ We think it was error for the trial court to permit the impeachment of Miss Orr without a factual showing that surprise existed. Particularly was this so here where the most reasonable inference which could be drawn from the record was that the prosecution was not at all surprised at Miss Orr's dubious opening statement that she was not sure she had seen a blackjack. It is easily inferred from, if not demonstrated by, the whole course of the trial that if the prosecution really believed she would testify in harmony with what McVarish said she told him they would have called her on their case in chief.

From the whole record we think the judgment appealed from must be reversed for the error we have discussed. The state of the case was this : Actively discarding any contention that Vonn's death was caused by a blow from a fist of appellant and electing to charge appellant with the high crime of an intentional homicide, the state professedly and continuously undertook to prove that appellant had a blackjack with him when he left the barroom with Vonn and struck Vonn with it immediately the two were outside, inflicting at once the injuries from which Vonn later died. Yet the prosecution did not ask either of two eyewitnesses it placed before the jury whether or not either had seen a blackjack in the hands of appellant or about his person, notwithstanding if such had been the fact these witnesses almost surely must have known of it. The prosecution also failed to call its star blackjack witness, Patricia Orr, on its case in chief. It chose to rely upon the unsatisfactory testimony of several witnesses who said they had seen differing types of bludgeons which might have been blackjacks at times varying from five years to about two years before the alleged homicide. As between the prosecution's theory of a blackjack killing and the defense's theory of an accidental death from a fall the prosecution sought to prove by expert testimony that their theory was the more probable. The experts' testimony turned out to be equivocal. Although called to testify in a field where only expert testimony could satisfactorily fix the probabilities, both expert witnesses refused to say that the one theory was more probable than the other. The situation was such that it was imperative the state buttress its theory with some-

thing better than it had offered up to the close of its case. What the state needed most was testimony that would, at least inferentially, put a blackjack in the hands of appellant as he left the barroom with Vonn. The prosecution claims to have believed that this testimony was available from Patricia Orr, yet she was not called on the state's case in chief. This was most unusual conduct and indicates strongly that the prosecution knew Patricia Orr would not testify as needed and that, so knowing, the prosecution took a calculated risk that if they did not call her the defense might and if the defense did not she could be called in rebuttal, asked a preliminary question, and if the reply was at all unsatisfactory she could be impeached on a claim of surprise, false in fact, and thereby there could be placed before the jury the impeaching hearsay testimony of McVarish. We think the situation was one where a miscarriage of justice has eventuated; that the hearsay testimony introduced into the record by way of impeachment was the pivot upon which the case turned, and that without it an acquittal was probable. Under such circumstances reversal is required.

In arriving at the foregoing conclusion the court has considered the giving of an instruction by the trial court reading as follows: "In respect to any attempt to impeach a witness by showing that on some former occasion he made a statement or statements that are contradictory of his testimony here, you are instructed that the evidence of any such contradictory statement is not received for the purpose of proving the truth of what then was said, but only for the purpose of testing the credibility of the witness, and you may consider such evidence only for that purpose; . . ." In view of the circumstances of this case we think that the giving of the foregoing instruction did not undo the damage done by the faulty impeachment proceedings and the wrongful introduction into the case of the hearsay testimony of Mr. McVarish.

There are a number of other assignments of error, but it is unnecessary to discuss them except to say that the charges of misconduct and of bias and prejudice on the part of the trial judge are wholly without support in the record. The charges of misconduct on the part of the prosecuting attorney are rather to be ascribed to the vigorous prosecution of a difficult case than to deliberate unfairness, save only that if, as the record so strongly indicates, the prosecuting attorney merely pretended surprise in order to place hearsay testimony before the jury then he was guilty of gross misconduct. We

do not know that that is so, but the situation is one where the failure of the trial court to try out the claim of surprise necessitates a reversal of the judgment.

The judgment and the order appealed from are reversed.

Peek, J., and Schottky, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 12, 1958.