[Crim. No. 6821.   In Bank.   Nov. 2, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT LEE KIDD, Defendant and Appellant.

Carl B. Shapiro, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, Arlo E. Smith, Albert W. Harris, Jr., and John S. McInerny, Deputy Attorneys General, for Plaintiff and Respondent.

WHITE, J.—In an indictment returned by the grand jury of the City and County of San Francisco in 1960, defendant was accused of the murder of one Alfred Clarke on or about December 13, 1954. Prior to the entry of a plea, counsel for defendant (then the public defender) moved the court for a determination of defendant's present sanity pursuant to the provisions of section 1368 of the Penal Code. Thereupon the court appointed two alienists to examine the accused. Their report advised the court that defendant was presently sane, and the court made a finding to this effect. Defendant entered a plea of not guilty. Trial was had before a jury at which defendant was represented by counsel of his own choice. The jury returned a verdict finding defendant guilty of murder in the first degree and imposed the death penalty. A motion for a new trial was denied. The instant appeal is before us automatically under section 1239, subdivision (b) of the Penal Code.

As to the factual background of this prosecution the record reveals that on December 14, 1954, a police inspector went to the address of Alfred Clarke, who lived in the rear of an antique shop which he owned and operated. The front door was locked, but the inspector was able to enter through a rear door and found the body of Clarke on a bed. Decedent had died from multiple traumatic injuries. There were about 30 lacerations on his head and face and numerous lacerations on his body and legs. His nose and ribs were broken, and there was a large burned area on his right foot. His hands had been tied behind his back. One of his pockets had been turned inside out, and the room where he was found had been ransacked. A vault containing $1,570 was subsequently discovered hidden under the kitchen sink. Blood of type "O," decedent's type, was on the walls and furniture. Two swords were found in the room, one lying on the floor near the body. On each sword was a fingerprint in dried blood, and these fingerprints were identified as defendant's. An analysis of the blood on one of the swords disclosed that it was type "A," which was defendant's type. There was no evidence establishing that blood of type "O" was on either of the swords. Material of some kind appeared to have been wiped off both swords.

There was evidence that instruments such as the swords could have caused the lacerations. However, Paul Kirk, a criminologist who testified on behalf of the defense, stated that in his opinion it would be "impossible for this sword not

to have a considerable amount of 'O' blood on it, had it been the murder weapon, and it should have been found by whoever examined it.'' He also testified that while it would be possible to wipe the sword blade well enough to obliterate any visible evidence of blood, it nevertheless would be impossible to do the same for the guard or handle, and that if an assailant and his victim had different blood types it would be highly improbable for the assailant to wipe off the blood of the victim and yet leave some of his own blood on the sword.

Defendant and his wife were living in San Francisco in 1954, and the day before the body was found defendant was seen with two men in a tavern a few doors from Clarke's antique shop. About four days after the body was found the police questioned defendant's wife concerning her husband's whereabouts, and told her that someone had reported to them that she had said that her husband had committed some serious crime and had left the city. She informed them that he had gone to Los Angeles. Shortly thereafter the police talked with her again, and she stated that she had not heard from her husband. On a third visit the police found that she had departed without leaving a forwarding address. The police attempted to locate defendant in Los Angeles and in March 1955 requested the F.B.I. to notify them if defendant was apprehended anywhere in the United States.

Over five years later, in June 1960, the police received a response from the F.B.I., and shortly thereafter a police officer interviewed defendant in a county jail in Indiana. Defendant denied that he was implicated in the murder and stated that he had not been in the antique shop. When informed that his fingerprints had been found in the shop, he replied that if so, he must have been there. He was then asked if he could explain how his fingerprints came to be in the shop in blood, and he answered that he had no explanation for that.

At the trial defendant denied that he had killed Clarke. He stated that he had lived in San Francisco for a few months in 1954, left in the latter part of December to look for work in Los Angeles, after a few days there moved to Chicago where he worked for about four months, and then moved to Gary, Indiana where he lived until June 1960. He further testified that while in San Francisco he and a man, who was a certified public accountant and whose name he thought was Clyde Reynolds, visited Clarke's antique shop, saw two swords, and began ''horse-playing'' with them. He stated

that his finger was cut somehow while they were playing and that he subsequently handled both swords.

There was evidence to the effect that no man by the name of Clyde Reynolds had ever been registered or licensed in California as a public accountant or certified public accountant, and no man named Clyde Reynolds was produced to testify.

Defendant contends that the trial court improperly prevented his attempt to impeach Coroner Henry Turkel; that the prosecutor was guilty of prejudicial misconduct in questioning Inspector Ralph McDonald about a "rap sheet" and assertedly waving it before the jury; that the police department's destruction of articles taken from Clarke's address prevented defendant from having a fair trial; and that the trial court erred in excluding testimony regarding the deterrent effect of the death penalty. We have concluded that the first two of these contentions are sound, and it is therefore unnecessary for us to consider on this appeal the several additional arguments of defendant.

Dr. Henry Turkel was called as a witness by the People and testified on direct examination concerning his visit to the place where Clarke's body was found and certain samples of stained areas in the room which he had taken. On cross-examination he was asked if he had made statements to the press within a day or two after looking at several items at the scene of the crime to the effect that death was caused by an instrument which made cross-like striations on the body, and that the instrument was not one of the two swords that was admitted into evidence. Objection was made by the prosecution on several grounds, one of which was that the question went beyond the scope of direct examination. Defense counsel immediately said that he would ask Dr. Turkel to return another day as a witness on behalf of defendant. The court did not rule on the prosecution's objection, but it is clear that the objection was valid.

Dr. Turkel was later called as a witness by defendant and testified on direct examination that an instrument such as either of the swords could have caused the injuries to Clarke. Defense counsel asked leave of court to cross-examine his own witness and asked the witness, "Isn't it a fact that you stated to the Press the date of this incident that these were not the murder weapons?" The prosecution objected to the question on the grounds that it was incompetent, irrelevant, and immaterial and that a proper foundation had not been laid. The

prosecution also stated, "There will be no claim of surprise here since he hasn't discussed this with the witness, as I understand it." The trial court sustained the objection. Defense counsel then stated that he was "trying to impeach a witness who made a statement six years ago as to these particular instruments and now makes a different statement." The trial court said, "He didn't make the statement to you, Mr. McFeeley [defense counsel]. You didn't discuss the matter with him. You may only impeach a witness if you are taken by surprise. How could you be surprised if you knew about the fact that the Press reported something different?" Defense counsel replied that he was entitled to rely upon the fact that a statement as reported by the press would be the statement of the coroner. The court replied, "Why are you? You are asserting that no mistakes are ever made, that the Press reports everything accurately." Defense counsel stated he was not saying that, and the court then said, "That is exactly what you are saying. You are relying on a statement to the Press as a remark, a truthful remark, made by the witness, aren't you?" Defense counsel said that he was and that he would submit the statement for identification. The court asked defense counsel if he could show any surprise, and counsel answered, "I am surprised." The prosecution again objected on the grounds that no foundation had been laid, and the court told defense counsel it would be necessary for him to lay some foundation. Defense counsel then asked the witness, "Isn't it a fact, Doctor, that after the Coroner's inquest that you stated that the two swords were not the actual cause of his death." An objection on the grounds that no proper foundation had been laid was sustained, and defense counsel said that he had no further questions.

When an attempt is made on cross-examination to obtain an admission from a witness of a prior inconsistent statement, it is not necessary to first relate to the witness the statement together with the circumstances of the time, place, and persons present, although such a foundation must be laid before the witness may be impeached by extrinsic evidence of the prior inconsistent statement. (*People* v. *Jones,* 160 Cal. 358, 364-365 [117 P. 176]; *People* v. *Capps,* 129 Cal.App.2d 429, 430-431 [277 P.2d 39]; *People* v. *Vollmann,* 73 Cal.App. 2d 769, 789 et seq. [167 P.2d 545]; *People* v. *Campos,* 10 Cal. App.2d 310, 317 [52 P.2d 251]; see McBaine, California Evidence Manual (1960), pp. 133-134). Where, as here, the witness sought to be impeached is the party's own witness,

additional considerations are present. Section 2049 of the Code of Civil Procedure permits contradiction of such a witness by showing prior inconsistent statements.[1] The courts have added the requirements that both surprise and damage be shown before such impeachment is allowed (*People* v. *LeBeau*, 39 Cal.2d 146, 148 [245 P.2d 302] ; see Witkin, California Evidence (1958), p. 719 et seq.) In the instant case it is obvious that Dr. Turkel's testimony was damaging to defendant, and the critical question is whether there was a sufficient showing of surprise.

The courts in many states hold that surprise is not properly a part of the impeachment rule at all, and the requirement of a showing of surprise has been criticized. (See 3 Wigmore on Evidence [3d ed.], p. 383 et seq.) In this state, however, a showing of surprise is necessary. The trial judge is vested with discretion in ruling upon whether surprise exists, but the purely formalistic concepts that the party producing a witness vouches for him and is bound by his testimony should not preclude impeachment where fairness requires it. (*People* v. *Spinosa*, 115 Cal.App.2d 659, 668 [252 P.2d 409].) Trial courts should be liberal in permitting such impeachment, and doubts should be resolved in favor of allowing the testimony. (*People* v. *Spinosa, supra,* 115 Cal. App.2d 659, 668.) The People claim that there was not a sufficient showing of surprise in the present case and cite *People* v. *Wilson,* 156 Cal.App.2d 728 [320 P.2d 117]. The court in the *Wilson* case held that where the surprise was disputed it was incumbent that the party seeking to impeach the witness show the basis of the surprise he claimed unless the surprise was obvious, and that it was improper for the trial court in that case to merely take the word of counsel that surprise existed. Here defense counsel not only stated that he was surprised but also showed the basis of his surprise by indicating that the witness' testimony regarding the swords differed from a statement the press reported the witness made six years ago. The witness was a public official, and it would not appear unreasonable for defense counsel to assume that the witness' testimony would be the same as the statement attributed to him by the press. Also the fact that the prosecution had called Dr. Turkel as a witness and had not asked

---

[1]Section 2049 of the Code of Civil Procedure provides: "The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony, as provided in section [2052]."

him his views as to whether the swords were the murder weapons, could well reinforce a belief that the coroner's testimony would be in accord with the newspaper article. Any doubts as to defense counsel's surprise should have been resolved in defendant's favor, and it was error not to permit defense counsel to proceed with his attempted impeachment. Whether the swords upon which defendant's fingerprints appeared were used in committing the murder was of course crucial to the issues. ▆▆ The evidence of defendant's guilt is highly circumstantial and conflicting and is not so clear and convincing but what this adverse ruling may well have turned the scales in favor of the prosecution. It is our opinion "that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson,* 46 Cal.2d 818, 837 [299 P.2d 243].)

In regard to the alleged misconduct of the prosecutor the record discloses the following: Defendant testified that in 1955 he went to Calumette City in Illinois and told the police there that he was wanted for questioning in San Francisco, that there was no arrest, that he "just walked in," and that he was held for several hours and then asked, "What do you want, a free ride back to San Francisco?" In rebuttal the prosecutor called Inspector McDonald who testified that his department sent a request to the F.B.I. in March 1955 asking to be notified if defendant was apprehended anywhere in the United States and that from the time of the request until June 1960 the department heard nothing from the F.B.I. regarding defendant's whereabouts. The prosecutor showed the witness a document and asked whether it was a photostatic copy of the record of the Department of Justice. The witness replied that it was, and in answer to a further question by the prosecutor as to what the record was, the witness stated, "This is what we refer to as a rap sheet. It is a complete record of any and all arrests of a certain individual or other matters that would be brought to the attention of the Federal Bureau of Investigation in Washington pertaining to them. For instance, application which called for fingerprints, and it indicates where they have been arrested and in some cases the charge, any place in the United States." He further testified that, "This copy is sent—or a copy similar to this—is sent back to the agency that reports an arrest. For instance, when an individual is arrested in San Francisco,

we take his fingerprints and send a copy to Washington. He may never have been arrested in San Francisco before. They will return a copy to us in San Francisco, and it may reflect any—it will reflect any arrest that he has had anywhere in the United States.'' The witness was then asked if there was anything on the document to indicate that defendant's fingerprints came to the attention of the F.B.I. from the time of the ''want'' in March of 1955 until the day of his arrest in Indiana. The witness replied, ''Yes there is.'' The court at this point intervened and said, ''Wait a minute . . . I am just suggesting, Mr. Maurer [assistant district attorney] that to caution you in respect to what is written in this document.'' The prosecutor replied that he had no intention of going into it. Defense counsel said, ''He has already gone into it, your Honor. I—— in the absence of the jury, I am going to make a motion for a mistrial.'' The witness then testified to the effect that from March 1955 until June 1960 no information was received regarding defendant. The trial court denied the motion for a mistrial and asked defense counsel if he wished an admonition given to the jury. Defense counsel indicated that he did not feel it advisable to do so since he believed an instruction would merely emphasize the matter.

The People contend that the F.B.I. report was used for a proper purpose, namely rebutting the claim of the defense that defendant had turned himself in to the police in Illinois in 1955. They cite *People* v. *Coefield*, 37 Cal.2d 865, 869 [236 P.2d 570] wherein it is stated that if evidence in a criminal case tends logically, naturally and by reasonable inference to overcome any material matter sought to be proved by the defense, it is admissible whether it embraces the commission of another crime or not. Here, however, there was no evidence that a contact with the Illinois police of the kind to which defendant testified would appear in the F.B.I. report. In the absence of such evidence it would seem doubtful that the report would logically and by reasonable inference rebut defendant's testimony. Moreover, Inspector McDonald had already testified that from March 1955 until June 1960 the San Francisco Police Department had not heard from the F.B.I. concerning the whereabouts of defendant, and from this it could be inferred that the Illinois police probably had not contacted the F.B.I. Showing the witness the ''rap sheet'' and questioning him about it added nothing to the prosecutor's case and was highly improper. The jury could easily infer from seeing the document in the hands of the prosecutor

and from the testimony about it that defendant had a long history of prior arrests.

If misconduct by the prosecutor is of such a character that it cannot be purged of its harmful effect by an admonition, it may constitute a ground for reversal even if no objection was made or admonition requested on behalf of the accused. Moreover, if guilt has not been so clearly established as to render it improbable that the harmful effect of the misconduct may have turned the scales against the accused, such misconduct has consistently been deemed a sufficient ground for reversal. (*People* v. *Lyons*, 47 Cal.2d 311, 318 [303 P.2d 329].) The present case clearly comes within this rule.

Numerous articles taken from Clarke's quarters were destroyed by the police department. Louis Reyff, a police officer, testified that the records of the police department showed that one package and thirty other various articles were received on January 5, 1955, and that in 1958 all the items were destroyed except for the two swords. He also stated that it was the practice of the police department to hold property for three years after the date that it was brought in, and then dispose of it. He testified that there might be a list of the items destroyed and that if so, another officer would probably have it. A list was not produced at the trial, and no other officer was called to testify about it. Defense counsel did introduce two police department laboratory reports concerning the examination of miscellaneous articles relating to Clarke, and it would appear probable that the items in these reports were among those destroyed.[2]

*People* v. *Carter*, 48 Cal.2d 737, 747 [312 P.2d 665] is relied upon by defendant in support of his contention that the destruction of the articles prevented him from having a fair trial. In that case the defendant claimed that the prosecution had deliberately destroyed material physical evidence, and defense counsel stated that he had requested an opportunity to have a criminologist examine the scene of the killing and that the district attorney had "stalled" on various pretexts

---

[2]The two laboratory reports disclose that glass decanters from the room where deceased was found had five partial latent prints and that on a bowl also taken from the scene there were some partial ridge patterns, one of which may have been made by the palm of a hand. According to the reports, the latent fingerprints were not made by the victim nor by a named suspect. The reports also show that the police examined various items of clothing, household goods, and a firearm hammer and hammer stud.

and finally told him that the premises had been cleaned up and returned to the owner. The court stated that if these allegations were true the state may have disabled itself from ever giving the defendant a fair trial. However the court found it unnecessary to decide the point, as under the facts there present the defendant had conceded that by the prosecution's turning over all its evidence taken from the scene an adequate substitute had been provided.　　　In the present case the evidence would indicate that there was not a deliberate destruction of evidence to prevent its use but rather that items taken from the scene of the crime were destroyed by the police in accord with established police practices. There is no showing that the items destroyed would have substantially benefited defendant's case or that the police were uncooperative in providing information regarding the property destroyed. Although it is obviously undesirable to have any potential evidence destroyed while there is a possibility a criminal prosecution might be brought, we are satisfied that the destruction of the property in the instant case did not prevent defendant from having a fair trial.

　　　During the phase of the trial dealing with penalty the defense called two members of the Legislature who had served on a committee considering whether capital punishment should be abolished, a lawyer, and a chaplain from San Quentin. They were offered as experts on the subject of whether or not the death penalty was a deterrent to crime, and when each of them was asked his opinion on this subject, objections by the prosecution were sustained. The objections were properly sustained, and defendant's contention that the ruling of the trial court constituted prejudicial error is without merit. Innumerable witnesses could be produced to testify on both sides of the question whether the death penalty serves as a deterrent to crime. As was said by this court in the case of *People* v. *Love, ante,* p. 725 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809], ''The [trial] court did not err in dismissing defendant's subpoena for Governor Brown and Warden Duffy. Defendant voluntarily dismissed the subpoena for Warden Duffy. He had subpoenaed Governor Brown to elicit his views on capital punishment. The penalties for first degree murder have been fixed by the Legislature. (Pen Code, § 190.) The wisdom or deterrent effect of those penalties are for the Legislature to determine and are therefore not justiciable issues. Hence evidence as to these matters is inadmissible. Juries in capital cases cannot become legislatures *ad hoc,* and

trials on the issue of penalty cannot be converted into legislative hearings.''

The instant case involves a close factual determination, and from an examination of the entire cause, including the evidence, we are of the opinion that it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the errors discussed above.

The judgment and the order denying defendant's motion for a new trial are and each is reversed.

Gibson, C. J., Traynor, J., Peters, J., and Dooling, J., concurred.

SCHAUER, J., Dissenting.—I agree with the majority's holding that the trial court ''did not err in dismissing defendant's subpoena for Governor Brown and Warden Duffy. . . . The penalties for first degree murder have been fixed by the Legislature. [Citation.] The wisdom or deterrent effect of those penalties are for the Legislature to determine and are therefore not justiciable issues. Hence evidence as to these matters is inadmissible.''

By its enactments (as more fully discussed in my dissenting opinion in *People* v. *Love* (1961) *ante,* p. 739) the Legislature clearly has determined that the death penalty, as the strongest deterrent against certain crimes of violence, is essential for the protection of potential victims of such crimes. Therefore, evidence on the legislative issue as to whether that penalty is or is not the greatest deterrent is inadmissible. Conversely, evidence is admissible to help the jury in determining in each case (as contemplated by Pen. Code, §§ 190 and 190.1) which of the two alternative, but not equal, penalties should be imposed.

The correct rules relative to the selection of penalty (as between death and so-called life imprisonment) are stated or indicated in *People* v. *Friend* (1957) 47 Cal.2d 749, 764 [8]-768 [13] [306 P.2d 463]. Insofar as appears proper to be quoted here, the opinion in that case declares (p. 764 [8]): ''We note . . . that the trend is toward the more liberal admission of evidence pertinent only to the selection of penalty. For example, it has become established practice to advise the jury *of the facts* concerning the possibility of pardon, commutation, parole, etc. [Citations.] Obviously, *the law* pertaining to pardons, commutations and paroles has not the slightest relevancy to the issue of guilt; it is pertinent only as

a *fact* which may be considered in selecting the penalty to be imposed; i.e., it is evidence which may be considered as relevant to the 'aggravation' or 'mitigation' of punishment in the sense in which those terms have been used in relation to the selection of penalty. . . . [P. 767 [13].] They [the jury] should be told . . . that beyond prescribing the two alternative penalties the law itself provides no standard for their guidance in the selection of the punishment; . . . that in deciding the question whether the accused should be put to death or sentenced to imprisonment for life it is within their discretion alone to determine, each for himself, how far he will accord weight to the considerations of the several objectives of punishment, of the deterrence of crime, of the protection of society, of the desirability of stern retribution, or of sympathy or clemency, . . .'' We pointed out also that (fn. 8, p. 766) ''For some years many courts and writers on criminal law and penology have held that the purpose of legally adjudicated punishment is not or should not be vengeance, but rather deterrence of the offender and *other prospective offenders from crime, . . .*'' (Italics added.)

I agree further with the majority that ''The instant case involves a close factual determination'' but I do not agree with them that any prejudicial error was committed. The close factual question was for the jury and the trial judge. Under rules of law which I deem to be controlling I accept their determination and would affirm the judgment and the order denying defendant's motion for a new trial.

McComb, J., concurred.

Respondent's petition for a rehearing was denied November 29, 1961. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.