[Crim. No. 2834.   First Dist., Div. One.   Jan. 30, 1953.]

THE PEOPLE, Respondent, v. JOSEPH E. SPINOSA, Appellant.

Nathan C. Coghlan for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Charles E. McClung, Deputy Attorney General, for Respondent.

PETERS, P. J.—Joseph E. Spinosa appeals from the order denying his motion for a new trial and from the judgment finding him guilty of illegal possession of heroin.

Appellant pleaded guilty to the charge of four prior state and federal narcotic convictions. On January 4, 1951, the date of the offense here involved, he was on federal parole. He testified that on January 3, 1951, he had met on the street one Severson, an old friend whom he had not seen for 10 years, and that Severson had invited him to visit him at the hotel in San Francisco where he was living. The next day, being in the vicinity of the hotel, he called upon Severson, testifying that, although he knew that Severson in the past had "fooled around" with narcotics, the purpose of this

visit was purely social. When appellant arrived at Severson's room one Morgan, who lived with Severson, was also there. Morgan immediately left.

Morgan and Severson had been under surveillance by two federal narcotic officers, Mulgannon and Traynor by name. When Morgan left the hotel he was taken into custody by these two officers, and the three men then returned to the room occupied by Severson. Morgan refused to seek admittance, so one of the officers knocked on the door, simulated Morgan's voice, and asked to be admitted. The two officers did not then know that appellant was in the room.

Appellant testified that this knock on the door occurred about five minutes after he had arrived. During that period he told Severson that he was out on parole and wanted to stay out of trouble. Severson told him that he, Severson, was not "fooling around" with narcotics.

Although appellant's testimony is somewhat confusing as to what happened when the agents knocked on the door, appellant finally testified that Severson jumped up, ran to the bathroom door, opened it, and then insisted that appellant go in the bathroom because he, Severson, wanted privacy with the visitors. There is also some confused testimony by appellant about a prior visit to the bathroom during the five-minute interval when some unidentified visitor called and Severson insisted that appellant retire to the bathroom. Although the trial court twice characterized appellant as an "evasive" witness, some of the inconsistencies appearing in his testimony can be explained by the fact that the record shows that appellant was not too bright and, on occasion, did not understand some of the long and involved questions asked him.

Mulgannon testified that when Severson opened the door he, Mulgannon, pushed the door fully open and saw a figure, later identified as appellant, rushing towards a door, which it later was discovered was the bathroom. The witness stated that he and appellant pushed back and forth on the bathroom door until Traynor came and lunged against it pushing it inward. A wrestling struggle took place between Traynor and appellant, and finally appellant was forced out into the bedroom and required to lie face down on the floor. Mulgannon, who had followed Traynor into the bathroom, testified that as he rushed into the bathroom he observed something floating in the toilet bowl. He removed a pink package that turned out to contain nine grains of heroin. This bindle was

wet only on one side when removed from the toilet. It is this bindle that constitutes the basis of the charge here involved.

The appellant's testimony depicts the facts quite differently. He testified that he was in the bathroom with the door shut a couple of minutes before the officers came in; that the two officers then dashed into the room like "bandits," and hit the bathroom door, knocking him down and jumping upon him. At all times he vehemently and consistently denied that he had placed the pink bindle in the toilet bowl, that it belonged to him, or that he knew it was there.

It should be here noted that these two federal agents were dressed in plain clothes and had no search warrant. They had no reason to believe that appellant was committing a crime in the room, because they did not even know that he was there. They did not identify themselves as officers when in the hallway, nor when they dashed into the room. They conceded that they did not mention that they were officers until after appellant had been dragged from the bathroom and was struggling with Officer Traynor in the bedroom. Admittedly Mulgannon was armed with a gun, but Traynor was unarmed. At some stage in the proceedings Mulgannon drew his gun and used it to subdue appellant.

It should also be noted that the State introduced into evidence a diagram of the bedroom and bathroom. For some unexplained reason the diagram failed to disclose that there were two doors to the bathroom, one leading to Severson's bedroom and the other, apparently, leading to an adjoining bedroom. The prosecutor, when this error was called to his attention, readily admitted the oversight, but failed to produce any evidence as to whether the second door was locked or unlocked, or where it led.

After appellant had been subdued he was searched, and nothing incriminating was found upon his person. The officers then searched the room and the other two occupants. Morgan had in his possession a white bindle containing six grains of heroin and some hypodermic equipment. On and under the bed near where Severson was sitting the two officers found two packages of marijuana cigarettes, containing a total of 171 grains of that narcotic. Severson, while at first denying ownership, finally admitted that this marijuana belonged to him.

There is much confusion in the record about the admissions of Severson when the narcotics were found. Both the agents and appellant agree that Severson stated that appellant did

not live in the room, was just a visitor, had only been there a few minutes before the raid, was out on parole, and should be given a "break." Appellant testified that Severson also stated that he, appellant, had nothing to do with the narcotics found by the officers, and that he, Severson, had thrown the pink bindle into the toilet. The two officers contradicted this testimony, stating that upon being questioned each of the three occupants denied ownership of the pink bindle, or that he had thrown it into the toilet.

At the trial Severson, who was then imprisoned at Folsom, was called as a witness by the appellant. He refused to answer most questions asked of him, claiming his privilege against self-incrimination, but finally did answer "no" when asked if he had dropped the pink bindle into the toilet. Thereupon, appellant attempted to impeach him, making an offer of proof that Severson had admitted, on appellant's preliminary hearing, that he had dropped the pink bindle into the toilet. The trial court, upon a showing that Severson had also testified at that hearing that he had not done so, held that appellant was not damaged by the testimony, and refused to permit the impeachment.

Appellant makes two major and many minor contentions on this appeal. In our opinion both major contentions are sound, which makes it unnecessary to consider the minor assignments of error.

The first major contention of appellant is that he was not permitted, on cross-examination of the officers, to develop the fact that the arrest was illegal, and was denied instructions proffered by him, to the effect that a person may use reasonable force to resist an unlawful arrest.

The appellant offered two instructions on this issue, both of which were refused. The first of these would have told the jury that a person subjected to an unlawful arrest may use reasonable force to free himself from the unlawful restraint. The second of these refused instructions outlined the circumstances under which a lawful arrest may be made as defined in section 836 of the Penal Code. It must be remembered that it was the theory of the appellant, supported by evidence produced on his behalf, that he was in the bathroom when the two officers, in plain clothes and without disclosing that they were officers (see Pen. Code, §§ 841, 843), broke into the bathroom and attacked him. At the trial the prosecution made much of the fact that appellant resisted the officers, and on the argument to the jury contended that such resistance

was equivalent to flight and, as such, an admission of guilt. But according to appellant's testimony, he did not flee at all, but was attacked in the bathroom. If his testimony were believed by the jury, then he was entitled to have the jury told that, under those circumstances, he had the lawful right to resist the attack, and that no adverse inferences could be indulged in because of such resistance.

The rule, supported by several cases, is stated as follows in 5 California Jurisprudence 2d, page 186, section 30:

"While it is the duty of every citizen to submit to lawful arrest . . . reasonable resistance to an unlawful arrest may rightfully be made either by the person sought to be arrested or by third persons acting in his aid. . . .

"The authority for the rule that if an arrest is unlawful, either the person being arrested or others acting in his behalf may resist, using no more than reasonable force, is derived from the statutes providing that lawful resistance to the commission of a public offense may be made by the party about to be injured. . . . These provisions are applicable because the effect of the statute defining false imprisonment as the unlawful violation of the personal liberty of another is to make an unlawful arrest a public offense."

On this appeal the respondent argues, as did the prosecutor at the trial, that evidence that the arrest was illegal was properly excluded because the resistance here involved was part of an attempt at flight, and that the state of mind of appellant in resisting would only be relevant had appellant actually known that the officers had no warrant. Here the evidence shows that the officers did not identify themselves as officers until after they dragged appellant into the bedroom and until that time said nothing about appellant's being under arrest. Certainly appellant was not required to prove that he did not know that the officers did not have a warrant when he testified that he did not know they were officers. While the evidence produced by the prosecution tended to show something akin to flight, appellant's testimony contradicted this evidence directly. Appellant was entitled to show that the arrest was illegal, and was entitled to instructions on his theory of the case supported by evidence To refuse appellant instructions and the right to produce evidence on this issue was error of a most serious nature.

The second serious error was committed when the trial court refused to permit appellant to impeach his own witness, Severson. As already pointed out, Severson was

called as a witness by appellant. Severson was then confined at Folsom. The trial court carefully instructed Severson as to his privilege against self-incrimination. Severson, on the ground of that privilege, refused to answer most questions, but did answer some, and did testify that he had not dropped the pink bindle of heroin into the toilet. Appellant then claimed surprise, and, outside the presence of the jury, offered to prove that before the committing magistrate Severson had testified that he dropped the pink bindle into the toilet. The prosecutor countered with the statement that at that same preliminary hearing Severson had testified that he knew nothing about the pink bindle. It was then admitted by all concerned that, at the preliminary hearing, Severson had first testified he knew nothing about the pink bindle, but on redirect examination admitted ownership of it, and admitted that he had thrown it into the toilet. The prosecutor argued that there could be no surprise when appellant knew that the witness had previously testified both ways on the issue. The trial court, on the assumed authority of *People* v. *Newson*, 37 Cal.2d 34 [230 P.2d 618], refused to admit the impeaching evidence, holding that a negative answer was not damaging within the impeachment rule.

The evidence should have been admitted. ■ To permit impeachment of one's own witness in this state, three elements must exist: (1) damage to the party calling the witness; (2) materiality of the evidence; and (3) surprise at his present testimony.

■ That the evidence was material is not disputed. But the trial court believed that, under the Newson case, a negative answer is never damaging, and on that ground sustained the objection. In that case the court held that it was error to permit the prosecution to impeach its own witness who, upon being expected to testify that she saw defendant upon looking into a drugstore where two murders were committed, testified that she did not see anyone. It was held that this evidence was not damaging since the witness did not say that the defendant was not there, nor that there was no one there. The court stated (37 Cal.2d at p. 41): "Where a witness states no fact against the party calling him, there is nothing to counteract. The testimony which may be contradicted must be prejudicial and detrimental, otherwise the previous statement shown would stand out, not as offsetting contrary testimony already given, but as substantive evidence of a fact." Thus the rationale of the decision was not that

a negative answer is never damaging, but that if the impeaching evidence is not needed to contradict, it should be excluded as serving no legitimate purpose.

The respondent, while admitting that there is some difference in degree between the damage caused the prosecution by the negative answer in the Newson case and the damage caused appellant by such answer in the instant case, nevertheless argues that it is the law that no legal detriment arises upon an answer entirely negative. In that connection, in addition to the Newson case, respondent places considerable reliance on the case of *People* v. *Godwin*, 123 Cal. 374 [55 P. 1059], a prosecution for seduction of a previously chaste woman. There it was held that the defense could not impeach a witness who, contrary to expectations, testified at the trial that he had not had intercourse with the prosecuting witness. It is argued that this case and the instant case are the same because in the Godwin case the "no" answer was some indication of the prosecuting witness' chastity, and so damaging to the defense, while in the instant case Severson's denial merely increased the odds that appellant had placed the heroin in the toilet. The two cases are not comparable. In the Godwin case the testimony of nonintercourse with the witness was only of the slightest damage to the defendant. Obviously, the failure to have had intercourse with one particular man does not mean that the prosecuting witness may not have had intercourse with every other male of her acquaintance. Each case must turn on its own facts. Here, under the facts, the jury was faced with but two probabilities —that is, that either Severson or appellant placed the heroin in the toilet bowl. There were other slight possibilities, but, from a practical standpoint those were the only two reasonable probabilities. Here the very basis of appellant's defense was that Severson placed the heroin where it was found. When Severson testified at the trial that he had not placed the heroin there, this was very damaging, indeed, to appellant. If believed, the only other reasonable alternative was that appellant must have been the culprit.

There are many cases holding that negative testimony can be damaging within the meaning of the impeachment rule. (See, for example, *Estate of Johnson*, 152 Cal. 778 [93 P. 1015]; *Rystinki* v. *Central Calif. T. Co.*, 175 Cal. 336 [165 P. 952]; *People* v. *Gallagher*, 12 Cal.App.2d 434 [55 P.2d 889]; *People* v. *Jaggers*, 120 Cal.App. 733 [8 P.2d 206]; *People* v. *Mallicoat*, 27 Cal.App. 355 [149 P. 1000].)

Moreover, there are cases that permit impeachment not because the trial testimony was detrimental, but because of the psychological loss of position before a jury caused by a disappointing witness. The most recent case of this type is *People* v. *LeBeau,* 39 Cal.2d 146 [245 P.2d 302]. There the defendant, accused of unlawful possession of narcotics, testified that he never had had narcotics in his possession, and never had had any contact with them. He denied, on cross-examination, that he was a user of narcotics, and denied telling one Nancy that he was a user of cocaine. In rebuttal, the prosecution called Nancy and asked her if LeBeau had not told her he was a cocaine user. She replied "No." The prosecution was allowed to impeach her by the testimony of a police inspector that prior to trial she had stated that LeBeau had told her that he was a user. This was upheld by the majority of the Supreme Court. The appellant, in that case, relied upon the Newson case for a reversal. The Supreme Court discussed that case as follows (p. 149) : "The Newson case did not, of course, purport to lay down a rule that all negative answers are harmless, and it is necessary to determine on the facts of each case whether the testimony of the witness sought to be impeached has actually damaged the party calling him." The court went on to hold that unless the prosecution was permitted to impeach Nancy it would create a damaging impression before the jury, because it would make it appear that the prosecution had been harassing defendant and attempting to discredit him by asking him if he were a user. "Under the circumstances the prosecution was entitled to correct this damaging impression by cross-examining its own witness. . . ." (P. 149.) (See, also, *People* v. *Deckert,* 77 Cal.App. 146 [246 P. 157] ; *People* v. *Wright,* 26 Cal.App.2d 197 [79 P.2d 102].)

The rule of the LeBeau case is here controlling. Here appellant, through his testimony, had built up the defense that Severson must have been the guilty party. When appellant produced Severson the jury could well expect that he was called to prove that fact. When Severson stated that he had not placed the heroin where it was found a most damaging impression was left with the jurors. To hold that evidence that the only other suspect involved did not commit the crime is not damaging is to close one's eyes to the realities of the situation. If the prosecution is "damaged" because of the possibility of creating a "damaging impression," as was held

in the LeBeau case, certainly the defense is "damaged" by testimony that the only other suspect involved did not commit the crime. The rule works both ways. In this case there was "damage" both in the testimonial and the psychological meanings of that term.

But, says the respondent, even if there were damage, appellant was not "surprised" by Sevenson's testimony because that witness, at the preliminary examination, had given evidence both ways on the subject under discussion. It is argued that the trial judge has a wide discretion in determining whether surprise exists, and that where the witness has given prior testimony both ways on the subject, the trial court, in its discretion, could determine that it was not "surprising" that the witness at the trial testified either way on the subject. Appellant argues that he had a legal right to presume that Severson would testify in accordance with his last testimony given at the preliminary, which was to the effect that Sevenson had thrown the heroin in the toilet.

■ This element of "surprise" as part of the impeachment rule has been added by the courts. Section 2049 of the Code of Civil Procedure merely provides that the "party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony . . ." There are many states that hold that "surprise" is not properly part of the impeachment rule at all. (See discussion and cases cited in III Wigmore on Evidence (3d ed.) p. 383, et seq.) But there can be no doubt that in this state the "surprise" requirement has been made by the cases an integral part of the impeachment rule. (See discussion in *Sandoval* v. *Southern Calif. Enterprises, Inc.*, 98 Cal.App.2d 240 [219 P.2d 928].)

■ The trial judge undoubtedly has some discretion in ruling upon whether "surprise" in the legal sense exists. (*People* v. *Jaggers*, 120 Cal.App. 733 [8 P.2d 206] ; *Sandoval* v. *Southern Calif. Enterprises, Inc.*, 98 Cal.App.2d 240 [219 P.2d 928].) However, the purely formalistic concepts that the party producing a witness vouches for him and is bound by his testimony, should not preclude impeachment where fairness requires it. Thus it has been held that the trial courts should be liberal in permitting such impeachment, and doubts should be resolved in favor of allowing the testimony. (*Stevenson* v. *Alta Bates, Inc.*, 20 Cal.App.2d 303 [66 P.2d 1265].)

We have been cited to no case, nor have we found any, that deals with the question as to whether a party is legally surprised when his witness at the trial testifies adversely when he knows that the witness has previously testified both ways on the issue, but his testimony latest in point of time was favorable to the one producing him. There are cases holding that the trial court can properly find against surprise when the witness sought to be impeached testified previously and at the trial in the same way. (*Anthony* v. *Hobbie*, 85 Cal.App.2d 798 [193 P.2d 748] ; *Sandoval* v. *Southern Calif. Enterprises, Inc.*, 98 Cal.App.2d 240 [219 P.2d 928] ; *Estate of Dolbeer,* 153 Cal. 652 [96 P. 266, 15 Ann.Cas. 207].) There are also cases holding that impeachment is allowed where the prior testimony is contrary to that given at the trial. (*People* v. *Gist,* 28 Cal.App.2d 287 [82 P.2d 501] ; *People* v. *Humphrey,* 27 Cal.App.2d 631 [81 P.2d 588] ; *Werner* v. *Southern Pac. Co.,* 44 Cal.App. 76 [185 P. 1016].)

What should be the rule where the witness has previously testified both ways on the question? An absolute rule cannot be laid down. It partly depends upon the nature of the testimony. But where a witness, previous to trial, and under oath, first denies that he committed the crime, and then admits that he did so, keeping in mind that by his admission he is confessing to the crime, it would appear that the defendant could reasonably suppose that, if the witness has once confessed to the crime, he would do so again. He is legally "surprised" when the witness testifies to the contrary at the time of trial.

There are other errors charged. The trial judge, on several occasions, without warrant so far as the record discloses, castigated appellant's counsel before the jury, on one occasion completely preventing any argument on a debatable issue and making a veiled reference to appellant's eventual right of appeal, thus indicating to the jury that he anticipated a conviction. These and other errors need not be discussed because they are not apt to occur on the new trial. The two errors discussed were clearly prejudicial. The evidence, while sufficient to support a conviction, is not strong. Undoubtedly the fact that appellant resisted the officers was telling evidence against him. When the trial court erroneously refused to permit appellant to produce the facts, if he could, to show that such resistance was lawful and reasonable, and refused to instruct on the issue, it dealt the defense a serious and prejudicial blow. When it refused to permit appellant to im-

peach Severson by showing that he had admitted his guilt at the preliminary hearing, such ruling took away from appellant his main defense.

The judgment and order appealed from are reversed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied February 14, 1953, and respondent's petition for a hearing by the Supreme Court was denied February 26, 1953.