[Crim. No. 1711. Fourth Dist. Aug. 30, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. JIM PHILLIP VASSAR, Defendant and Appellant.

Morris Lavine for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Samuel L. Williams, Deputy Attorney General, for Plaintiff and Respondent.

GRIFFIN, P. J.—Defendant-appellant was charged with and was convicted by a jury of unlawfully, and in violation of Health and Safety Code, section 11502, furnishing, giving and administering a narcotic other than marijuana, to wit, heroin, to a minor, Harry James Montellano, on July 6, 1961.

### FACTUAL BACKGROUND

About 10 p. m., on July 6, 1961, Harry James Montellano, aged 18, went to defendant's house in Indio in his car, talked to defendant about narcotics, and when defendant asked him if he wanted a "fix," Montellano said "Yes." Defendant left the house for about five minutes and picked up the "fix" somewhere in the yard and returned. They went in defendant's car to a rock pit, parked, and Montellano watched out for cars while defendant put the "stuff" into a spoon, added a little water, lighted a match and cooked it. Defendant then put the "stuff," which was brown in color, into a hypodermic needle and gave it to Montellano, who injected himself in the arm with the needle. After pulling the needle out, Montellano passed out. En route to the City of Indio, and shortly after midnight, defendant had an accident with his car and a police captain saw defendant standing beside the left fender of his parked car. Montellano was unconscious in the vehicle, on the passenger side in the front seat. Another officer took the two men down to be booked. Within 30 minutes thereafter, the captain returned to the scene, made a thorough search of the vehicle and found a clear plastic tube about two inches long and about a quarter of an inch in diameter with certain printing on the side. It was partially under the back portion of the front seat. It was a piece of plastic used in packing hypodermic syringes for shipment to prevent damage to the points. In the early morning hours of July 6, 1961, Dr. Allen J. Fisher examined Montellano at the jail. Montellano was very drowsy; his eyes were closed most of the time. He resisted the doctor's questioning and kept saying, "Just leave me alone, I want to

sleep, I want to sleep." He was under a heavy sedative of some sort. A small puncture mark was found just over a vein on his right forearm.

Dr. Robert A. Dexter testified that heroin is prepared by dilution in water by the user, usually with the aid of heat to make it dissolve more completely, and then it is drawn up into some type of syringe and injected, usually intravenously, into the vein of the user, commonly on the forepart of the elbow. He testified, in reply to a hypothetical question, that the 18-year-old mentioned in the question undoubtedly received an injection of some hypnotic drug, a drug which was administered in the manner commonly used in the administration of heroin, and most likely it was heroin that was injected. Another qualified expert witness, Joseph H. House, testified, in response to the same hypothetical question, based on the evidence related, that it was his opinion that the man described in the hypothetical question had an injection of heroin. Defendant failed to take the stand and testify.

Defendant produced his sister, who testified that she was present when Montellano came to defendant's house that night; that she talked with him and smelled alcohol on his breath and that she was of the opinion that he was under the influence of alcohol. Defendant called as a witness an officer who searched defendant's premises under a search warrant on June 29 and on July 6 and found no narcotics.

## CONSTITUTIONALITY

 Defendant's counsel contends that Health and Safety Code, section 11502, is unconstitutional, in that it is vague in failing to define who constitutes a minor within the meaning of that section. (Citing such authority as *In re Peppers,* 189 Cal. 682 [209 P. 896]; *Lanzetta v. State of New Jersey,* 306 U.S. 451 [59 S.Ct. 618, 83 L.Ed. 888].) We see no merit to this contention. The argument is that Civil Code, section 25, cannot be considered in connection with section 11502 of the Health and Safety Code in determining who is a minor. It is a well-recognized rule that for purposes of statutory construction, the codes are to be regarded as blending into each other and constituting but a single statute. (*In re Porterfield,* 28 Cal.2d 91, 100 [168 P.2d 706, 167 A.L.R. 675]; *Proctor v. Justice's Court,* 209 Cal. 39 [285 P. 312]; *People v. Darby,* 114 Cal.App.2d 412, 422 [250 P.2d 743].) Although section 11502, *supra,* does not in itself define a minor, section 25 of the Civil Code does. It provides that:

"Minors are all persons under 21 years of age . . . any person who has reached the age of 18 years and thereafter contracts a lawful marriage, or who has contracted a lawful marriage and thereafter reaches the age of 18 years, shall in the first instance upon contracting such marriage, and in the second instance upon reaching the age of 18 years, be of the age of majority and be deemed an adult person for the purpose of entering into any engagement or transaction respecting property or his estate, or for the purpose of entering into any contract, or for the purpose of maintaining or defending an action affecting his marital status, including therein any action or proceeding involving his support or the support or custody of children of the marriage, or determination of property rights, the same as if he were 21 years of age."

There is no qualifying language in section 25 which limits the use of this definition of the Civil Code or any part thereof. ██ In construing a particular provision of any of the codes, reference can well be made to any of the other codes for clarification. (*In re Porterfield, supra,* 28 Cal.2d 91, 100.) In *Smith* v. *Superior Court,* 187 Cal.App.2d 609 [10 Cal. Rptr. 1], the court had to determine the meaning of "minor" as used in Business and Professions Code, section 4234. It looked to section 25 of the Civil Code and integrated the definition of "minor" therein contained into section 4234 of the Business and Professions Code. Although Health and Safety Code, section 11502, does not define the term "minor" within the meaning of that section, it is not unconstitutionally vague. Reference to Civil Code, section 25, may be used to determine with certainty the scope of the class of persons delineated as "minors." ██ Section 11502 does not abrogate the due process of law guaranteed by the Fourteenth Amendment to the Constitution of the United States, as claimed.

██ In this connection, it is also argued that the court erred in rejecting evidence in reference to the age of Montellano and the claim that he was not a minor under Civil Code, section 25, since he was married when he was 18 and later divorced. That section clearly provides that all persons under 21 years of age are minors. The exception in reference to marriage is clearly set forth. Even if the proffered evidence had been admitted and the instruction based thereon given, it would have no application here. Montellano did not come within the exception. *Smith* v. *Superior Court, supra,* 187

Cal.App.2d 609, held that all persons under the age of 21 are minors within the meaning of Business and Professions Code, section 4234, making it a felony to unlawfully furnish any hypnotic or dangerous drug to a minor, though such drug be furnished to a married female over the age of 18.

■ "The trial judge in a criminal case is only required to instruct the jury on the law relating to the facts established in the case and on matters vital to a proper consideration of the evidence." (*People* v. *LaGrange,* 163 Cal.App.2d 100, 105 [328 P.2d 816].) (See also *People* v. *Buffum,* 40 Cal.2d 709, 724 [256 P.2d 317] ; *People* v. *Putnam,* 20 Cal.2d 885, 890 [129 P.2d 367].)

### INSUFFICIENCY OF EVIDENCE

Next, defendant claims that the evidence was insufficient to show that Montellano was injected with a narcotic, to wit, heroin, on or about July 6, 1961. ■ The narcotic content of a substance may be proved by circumstantial evidence. (*People* v. *Sanchez,* 197 Cal.App.2d 617, 621 [17 Cal.Rptr. 230] ; *People* v. *Rios,* 127 Cal.App.2d 620, 621 [274 P.2d 163] ; *People* v. *Candalaria,* 121 Cal.App.2d 686, 690 [264 P.2d 71].)

It is true that Montellano, who was not familiar with heroin, did not testify that it was heroin that was injected into his arm. He did testify that defendant and he were talking about narcotics and that defendant asked him if he wanted a "fix." This word has considerable significance in layman's parlance and is so recognized in *People* v. *Kimbley,* 189 Cal.App.2d 300, 302 [11 Cal.Rptr. 519], where a "fix" is defined as the illegal injection of a narcotic. One expert witness testified in the instant case that the question, "Do you want a fix?" indicates, in the language of the narcotic user, "an offer of heroin." One such witness, Dr. Dexter, testified, in respect to the factual hypothetical question, that the 18-year-old undoubtedly received an injection of some hypnotic drug, most likely heroin. Another expert witness testified that in his opinion it was heroin. Section 11502 of the Health and Safety Code, then in effect, made it an offense to furnish such minor with "any narcotic," without naming the particular narcotic. The jury was justified in believing that defendant did furnish Montellano with a narcotic, in violation of the section, and that it was heroin. (*People* v. *Rios, supra,* 127 Cal.App.2d 620, 621.)

■ In this connection, it is also contended that there was no evidence that defendant was 21 years of age or over; that

Health and Safety Code, section 11502, as amended in the statutes of 1961, chapter 274, section 4, page 1303, effective September 15, 1961, provides that every person 21 years of age or over who furnishes "any narcotic other than marijuana" to a minor, is guilty of an offense, and accordingly, there being no evidence of defendant's age, the judgment must be reversed.

Section 11502, *supra,* as worded on July 6, 1961, the date of the commission of the offense, made no requirement that the person furnishing such narcotic must be 21 years of age or over. The amended information was filed on August 15, 1961. The case went to trial on September 7, 1961, and was concluded on September 8, 1961. The 1961 amendment had not gone into effect at that time. Therefore, any evidence as to the age of defendant at that time would have been immaterial and an instruction based on the new statute was properly refused.

## HYPOTHETICAL QUESTION

Complaint is made that the court committed error in not requiring, as a proper foundation, that the prosecution set forth all the facts shown relating to the substance injected into the arm of the minor and upon which the experts based their opinions. Included within the hypothetical question propounded were, in general, the facts above-related, which were related by the witnesses, and upon which the experts formed their opinions. These are not an unfair statement of the facts in evidence. Counsel thoroughly cross-examined the experts on other deductions which might have been made from that testimony, and there was no change in the opinions. Dr. Fisher was not asked a hypothetical question. He gave an opinion based upon his examination of Montellano. ██ The general rule is that, while each hypothesis contained in the question should have some evidence to support it, it is not necessary that the question include a statement of all the evidence in the case. The statement may assume facts within the limits of the evidence, not unfairly assembled, upon which the opinion of the expert is required, and considerable latitude must be allowed in the choice of facts as to the basis upon which to frame a hypothetical question. (*People* v. *Wilson,* 25 Cal.2d 341, 348 [153 P.2d 720].) The opinions expressed did not invade the province of the jury. (*People* v. *Patterson,* 169 Cal.App.2d 179, 184 [337 P.2d 163]; *People* v. *Wilson, supra.*)

## OTHER TRANSACTIONS

Next, defendant complains because the prosecution produced as a witness one Hugh Adams, who was then confined in state prison. Adams testified that he knew defendant in Indio; that he (Adams) went to Mexico in his car; that he exchanged the car for a grayish powder contained in a piece of rubber and was told that it was heroin; that he returned to Indio on June 19, 1961, and saw defendant Vassar. Adams was asked if he gave some of the powder to defendant Vassar and he replied, ''No, I didn't give him any.'' The prosecution claimed surprise and stated that this reply was just opposite to what the witness told the two investigators about it. The prosecution then asked if he knew Detective Orson, and Orson stood for identification. The witness replied in the affirmative. When asked if he did not on June 28, 1961, talk to Orson, he answered, ''Yes.'' He was asked if they did not talk about heroin and he replied, ''Yes.'' Adams was asked if he pointed out a wastebasket, containing a little box, to Orson; and if he picked up the box and showed it to the detective, and he replied, ''Yes.'' He was asked if he did not say at that time, ''This is the heroin'' and he replied ''I could have said it''; that he was then asked if Orson asked him ''Is this what you got from the sale of the car?'' and he replied, ''I don't deny it,'' that he could have said it; that Orson asked, ''Where is the rest of it?'' and he said, ''I gave it all to Vassar.'' Adams stated that he told Orson this, but that it was not true that he gave any to Vassar; that he had said this because he (Adams) was sick. Adams was then asked if, on August 22, 1961, he was questioned by one Lloyd Bowler, an investigator for the district attorney, and that on that occasion he (Adams) told him, ''I sold a truck in Mexico for approximately one-half an ounce of heroin about June 21, 1961'' and Vassar asked him for some to use the next day and he gave the heroin to Vassar and he took it into the house. Adams answered, ''Yes,'' that he had told Bowler that. He denied at the trial that he gave Vassar any heroin. Counsel for defendant objected to this testimony on the ground that similar transactions or other offenses were not admissible against defendant, and that the prosecution did not lay sufficient foundation for impeachment of his own witness. (Citing such authority as *People* v. *Albertson,* 23 Cal.2d 550 [145 P.2d 7] ; *People* v. *Adams,* 14 Cal.2d 154, 162 [93 P.2d 146] ; *Bram* v. *United States,* 168 U.S. 532 [18 S.Ct. 183, 42 L.Ed. 568] ; *People* v. *Zammora,* 66 Cal.App.2d 166 [152 P.2d 180] ; *People* v. *Flores,* 37 Cal.

App.2d 282 [98 P.2d 326]; *People* v. *Newson,* 37 Cal.2d 34 [230 P.2d 618]; Code Civ. Proc., § 2049.)

If the testimony of Adams may be considered as attempting to establish another transaction or the commission of another offense, it appears to us that such a transaction was so clearly connected with the present offense charged that such testimony was relevant and admissible. (*People* v. *Peete,* 28 Cal.2d 306, 314 [169 P.2d 924]; *People* v. *Sykes,* 44 Cal.2d 166, 170 [280 P.2d 769]; *People* v. *Woods,* 35 Cal. 2d 504, 509 [218 P.2d 981]; *People* v. *Dabb,* 32 Cal.2d 491, 499 [197 P.2d 1].)

Whether the prosecution sufficiently established surprise in order to impeach its own witness may be a closer question. It is defendant's contention that the prosecutor was required to be sworn and take the witness stand and testify in reference to the claimed surprise and then subject himself to cross-examination on the subject, and that the court then must rule on the question of surprise. (Citing *People* v. *Zammora, supra,* 66 Cal.App.2d 166, 215.) We do not believe that the cases relied upon go to this extent. The general rule is stated in *People* v. *Flores, supra,* 37 Cal.App.2d 282, 287, to be that the party producing a witness cannot claim surprise and thereby *ipso facto* acquire a right to cross-examine such witness simply because the latter does not testify as expected; but, upon being taken by surprise by a witness who gives testimony contrary to that which is expected, counsel may, upon announcing surprise, ask leave to examine the witness by leading questions, or, in other words, to cross-examine the witness. But the asserted surprise must be genuine and opposing counsel may dispute the alleged surprise, thereupon raising an incident or collateral issue which necessarily must be disposed of by the trial judge, and counsel disputing the alleged surprise may ask leave to cross-examine the witness in connection with such subject, and may offer other evidence relevant to the issue. Whether counsel who produced the witness may be permitted to cross-examine such a witness depends upon the determination of the issue thus presented. Under such circumstances, where a witness is asked if he made certain statements involving defendant in the offenses charged against him, if the witness admits making the statements, the proper inquiry following such admission is whether such statements are true, and such admission could be followed by questions serving to elicit the evidence directly from the witness,

328

But if the witness, while admitting having made such statements, denies the truth thereof, or declares such statements to be false, the inquiry is at an end.

Here, the officers were not called to dispute any of the witness' testimony. In fact, the witness practically admitted that he made the statements about which he was questioned, but denied the truth of such statements. Under the circumstances, the inquiry should be and was at an end. The prosecutor claimed and represented to the court that he was taken by surprise and considerable facts were revealed so indicating, particularly where the prosecutor had been informed by the investigators that the witness had made the statements indicated. The witness did claim, on cross-examination, that he had previously told the investigators that he did not deliver the heroin to defendant. The trial court passed on the question of claimed surprise, damage and materiality (the three elements required [*People* v. *Wilson,* 156 Cal.App.2d 728 [320 P.2d 117]]) and allowed the examination indicated. We perceive no prejudicial error in this respect. (*People* v. *Spinosa,* 115 Cal.App.2d 659, 669 [252 P.2d 409]; *People* v. *Gist,* 28 Cal.App.2d 287 [82 P.2d 501]; *People* v. *Humphrey,* 27 Cal.App.2d 631 [81 P.2d 588]; *People* v. *Jaggers,* 120 Cal. App. 733 [8 P.2d 206]; Code Civ. Proc., § 2049; *Stevenson* v. *Alta Bates, Inc.,* 20 Cal.App.2d 303 [66 P.2d 1265].)

Next, counsel for defendant claims the prosecution erred in its examination of its principal witness, Montellano. Montellano testified at the preliminary examination and also testified at the trial. At the trial, his memory of what he had said at the preliminary hearing had, to a great extent, failed him, and he so stated. After testifying that he went to defendant's home, asked for a fix and went to the rock pit, he was asked if, while seated in the car, he saw defendant fixing the ''stuff''; he answered that he didn't know how he fixed it and that all he saw was a match strike. He was asked if that was all he saw and he said, ''Yes.'' The prosecutor then stated that he would like to refresh the witness's recollection from the preliminary examination transcript. Objection was made, contending that he was endeavoring to impeach his own witness. The district attorney stated that he was not asking to impeach his own witness. Later, he claimed surprise and damage. In the absence of the jury, the prosecution pointed out the page and line of the preliminary examination testimony of the witness and the court allowed the district attorney to further examine the witness. The witness was shown his former testimony and

was asked if he gave the following answers to the following questions:

"Q. So how did he fix the stuff? A. Well, just —— well, just get the stuff and put it in the spoon and add a little water and light a match and cook it.

"Q. So what color was the stuff that was put in the spoon and cooked? A. I don't know—dark brown.

"Q. What process did the defendant use to cook the stuff? A. Match.

"Q. Was it a single match or a series of matches? A. I don't know—I guess several matches.

"Q. So what did he do then after the stuff was cooked? A. I guess he put it in the needle—I don't know what you call it.

"Q. Would you say in a hypodermic needle—He put it into a hypodermic needle? A. Yes.

"Q. What did the defendant do after he put the stuff into the hypodermic needle? A. Well, he gave me—gave it to me."

When asked if the questions were asked, if he gave the answers shown, and if the answers were true, Montellano answered in the affirmative. The prosecution then asked, "And that refreshes your recollection, is that right Mr. Montellano, as to what happened on that occasion?" He replied, "Yes." The witness then proceeded to answer other questions propounded to him at the trial to the effect that after the substance was put in the needle it was given to him and he said, "I shot myself . . . in the right arm with it," pulled it out and passed out. On cross-examination by defendant's attorney, the witness said he really didn't know the color of the "stuff"; that he guessed defendant put it in the needle, and in essence the only thing he really knew was that he saw a spoon, a match was lighted and a needle was handed to him, and that he had never before used narcotics.

Defendant made the same argument, and cites the same authorities, as was made in respect to the witness Adams on the question of impeachment of the prosecution's own witness. A fair interpretation of the evidence indicates that the prosecutor was, in effect, refreshing the memory of the witness as to his former testimony, and the witness so indicated. At any rate, the trial court allowed the questions to be asked and the witness admitted that the answers indicated were given and that they were true, and stated in response to defense counsel's question that it was the first time he had used narcotics.

It is the rule that prior testimony of a witness is not competent evidence to prove the truth of the matter contained therein. However, such testimony can be used for impeachment purposes, or to refresh the recollection of the witness. (*People* v. *Zammora, supra,* 66 Cal.App.2d 166, 218.) In the *Zammora* case, it was held that the purpose of refreshing the recollection of a witness, such as by reading testimony previously given by him, is to enable both the witness and his present testimony to be put fairly and in the proper light before the jury; that there are two types of cases wherein the refreshing of the recollection of a witness is permissible: (1) where there is a present absence of recollection, and (2) where there is an apparent variance between the present testimony of the witness and the prior testimony or statement. It was there further held that if the purpose of the examination of a witness is to reconcile or explain testimony given by him on another occasion with that given by him at the trial, the memory of the witness may be refreshed; but if the purpose is to contradict or discredit the present testimony and to have the contradiction stand unreconciled and unexplained, then it is impeachment, and a pretense of refreshing the memory by reading former testimony cannot be made a subterfuge to get before the jury incompetent evidence or statements which aid the prosecution. It appears to us that the use of the testimony of the witness was for the purpose of refreshing his memory and it appears that it was done in good faith. We perceive no prejudicial error. There was no miscarriage of justice nor a denial to the defendant of a fair trial. (*People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243] ; *People* v. *Sandoval,* 119 Cal.App.2d 777, 782 [260 P.2d 153].)

Judgment and order denying new trial affirmed.

Shepard, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 24, 1962.