[Crim. No. 3701.   First Dist., Div. Two.   Feb. 19, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ERNEST C. PICKENS, Defendant and Appellant.

George T. Davis for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Arlo E. Smith and Albert W. Harris, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

TAYLOR, J.—This case is before us for a second time. Our original decision was rendered on March 16, 1961. On January 15, 1969, the State Supreme Court, treating appellant's petition for a writ of habeas corpus as a proceeding to recall the remittitur, directed this court to recall the remittitur, vacate the judgment and determine the appeal in the light of *Bruton* v. *United States,* 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], *Roberts* v. *Russell,* 392 U.S. 293 [20 L.Ed.2d 1100, 88 S.Ct. 1921], and the constitutional harmless error rule of *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].

Our prior opinion fully sets forth the facts and our reasons for rejecting the claims of error raised at that time by appellant. Although additional points have now been raised, no valid reason has been advanced to bring us to a different conclusion.

Accordingly, we adopt a portion of the prior opinion as constituting, to the extent thereof, the present opinion of this court. Appellant, Ernest C. Pickens, and Walter Senior were jointly charged by indictment with the murder of Charles Ackley on or about February 26, 1959. Both entered pleas of not guilty and were tried together before a jury which found appellant guilty of first degree murder and Senior guilty of second degree murder. Senior was sentenced, and by stipulation of counsel, the jury was discharged and appellant's punishment fixed by the court at life imprisonment. Appellant's motion for a new trial was denied and judgment entered. No appeal has been taken by Senior. On this appeal from the judgment, appellant argues that: 1) the evidence does not support the verdict; 2) the trial court erred to his prejudice by allowing the district attorney to improperly impeach his own witness; 3) he was denied due process of law by the admission into evidence of an illegally obtained involuntary confession of the codefendant, Senior.

The record reveals the following facts: On March 2,

1959, at about 8 a.m., the body of an individual in his middle sixties, weighing approximately 180 pounds, was found in a grove of trees across from the Sharp Park Golf Course. The autopsy was performed at 1:30 p.m. on March 3, 1959, and it was estimated that death had taken place from 30 to 48 hours earlier. The autopsy disclosed extensive trauma of the entire body. A 2-inch-wide strip of the head had been shaved from the forehead to the back of the head. There were superficial abrasions and lacerations of the skin along the shaved strip and a slightly depressed abrasion about 1 inch in diameter on the right forehead. The eyes were swollen shut and discolored, evidencing hemorrhages; the nose was markedly distorted, showed a fracture of the nasal cartilage and was filled with dried blood. The upper lip had a cut through the entire lip and the lower lip showed a deep laceration. Both lips were covered with blood and dirt; like material was on the tongue. There were numerous small bruises around the neck and shoulders and on the back, chest, left abdomen and hip and areas of discoloration about 1 inch in diameter, representing similarly inflicted types of injury, as well as breaks in the skin over the left hip and left thigh and similar injuries to the buttocks.

The chest area showed a complete transverse fracture of the entire body of the sternum. As the sternum at the point of fracture is a little less than 1 inch thick, pressure in excess of 100 pounds is needed to cause a fracture. Such pressure may be caused by a kick from a horse, a body impinged on a steering wheel or by one person jumping on the chest of one lying prone. The rib cage was fractured on both sides and the lungs were both lacerated by fragments of the fractured ribs.

The coloration of the various bruises indicated that all were not inflicted at the same time, but it was clear that all of the injuries were inflicted before death. The county pathologist was of the opinion that the more recent bruises were inflicted 24 hours before death and the older bruises represented an additional 24 hours. The county pathologist also testified that this was the most severe infliction of injury by human intervention that he had ever seen and concluded that death had been caused by the numerous injuries described above, and that a person with such injuries would suffer severe pain and have great difficulty breathing and moving.

On March 12, 1959, a gunny sack containing blood stained clothing, including a belt with the name Charles Ackley on it,

was found at Devil's Slide, south of the place where the body had been found. The body was identified as Charles Ackley.

On March 11, 1959, Mary Maribo was picked up and booked as a drunk by police officers of San Mateo County; she knew the victim, Charles Ackley, who also lived at the Vincent Hotel on Turk Street in San Francisco. On Wednesday, February 25, 1959, appellant, Pickens and Senior helped her move from the Vincent Hotel to a room on 16th Street. Appellant lent her the money to pay the rent on her new quarters. As she couldn't move her trunk and other large items to her new home, appellant took them to his home on Lee Street in San Francisco.

The next day, Thursday, February 26, Mary saw Ackley about 11 a.m. on Valencia Street with one Staley; Ackley was drunk and staggering. Mary called appellant's wife, Wanda, to see if they were going to bring her trunk and things. Mrs. Pickens then invited Mary to come out and help put up some curtains at the Pickens home. Appellant and Senior picked up Mary in their truck about noon and took her to the Pickens home; they then left for a short while to get some groceries. They returned about 1 p.m. with the groceries and two fifths of wine. Mary told Wanda that Ackley had said Wanda had been a prostitute before her marriage. Wanda repeated this to appellant, and apparently gave him the impression that Ackley had said that appellant had held Wanda while Ackley had intercourse with her. Mary then repeated what she had said and told appellant that Ackley had said other things about him in a bar. Appellant got very angry, called Ackley a dirty name, cursed, and threatened to make Ackley commit an indecent act with his dog. Appellant and Senior then left.

They returned to the Pickens home about 5 p.m. with Ackley and brought him into the house. Ackley's teeth were out of his mouth and his lips were bleeding. Appellant pushed Ackley into a chair and asked him about the alleged statements. Ackley denied making the statements but appellant said he knew Ackley had said them and slapped Ackley in the face. Ackley and appellant slapped at each other until Senior entered and hit Ackley in the face. Ackley tried to defend himself but could not do very much against his two assailants. The two women left the room and could hear the sound of flesh hitting flesh.

When Mary returned to the living room a short time later, Ackley was naked and lying on the floor. Appellant told her to kick Ackley in the groin, which she did. Wanda and ap-

pellant also kicked him. The two women again left the room; when they returned, they noticed that Ackley's head had been shaved from his forehead to the back of his head, and he was sitting in a chair and asking appellant and Senior to stop.

Appellant went outside and came back with a large dog. Ackley said: ''No, no, no,'' and appellant said ''Oh, yes,'' and then pushed Ackley's head between the dog's legs. Mary again left the room. When she returned, Ackley was lying on the floor with one eye closed and his entire face bloody and mashed up. Appellant and Senior were sitting on the davenport. As Ackleys' blood was getting on the rug, they moved his head into the fireplace. There was blood on the floor from his nose, and feces on his body.

About 9 p.m., Mary and Senior left in a cab; appellant told her she hadn't been out there and advised her to say she hadn't seen Ackley that day. The next day, February 27, Mary called the Pickens home and appellant told her Ackley was all right. He repeated his warning of the night before, i.e., that she didn't know anything about it and had not been there. That evening, Senior told Mary that Ackley was in the basement of the Pickens home and that he had put some clothes on him and given him coffee, wine and a pill and that he had cleaned up the Pickens living room. The following day, Saturday, February 28, Mary again spoke to Senior, who told her that Pickens had said that Ackley had left. The next day, Sunday, March 1, Senior told Mary that he didn't know where Ackley was. On Monday, March 2, Mary read about the body found at Sharp Park. Senior came to her room and she said: ''My Lord, that was, that was Ackley's body out there''; he said: ''Yeah. Kid, the heat's on.'' He told Mary to stay in her room and not go out in the bars and promised to bring her all she wanted to drink in her room if she did not go out in the bars or streets.

On Saturday of the following week (March 7), appellant came to Mary's room. Senior was there and all three went to the Pickens home. Appellant again told her to remember that she knew nothing about this and had not been there He also told her that the last time she had seen Ackley was with Staley on the morning of the 26th. Later, Senior told her he had tried to get rid of Ackley's clothing. Mary identified the clothing found at Devil's Slide as the clothing Ackley had when he was brought to the Pickens home on February 26.

Later, Mary went to a bar and was questioned by two officers. When she told Senior about this, he cursed, threatened and struck her. She called appellant who told her that Senior

would apologize, which he did.

Lena Galli testified that on the afternoon of February 26, she saw two men force a man out of a car, beat him, and put him in another car at 16th and Valencia Streets. Opal Fanning testified that about 4 o'clock that same afternoon, appellant and Senior visited her and appellant told her they would really take care of Ackley; Senior told her: "Me and Ernie are going to find Chuck [Ackley] and if Ernie [appellant] is going to do any killing, I'll help him."

The first argument on appeal is that the evidence does not support the verdict of first degree murder, but at most shows murder in the second degree, or voluntary manslaughter. Section 189 of the Penal Code, so far as relevant, defines murder in the first degree as "all murder which is perpetrated by means of . . . *torture.*" (Italics added.) ▮ Murder by torture is characterized by the intent of the defendant to inflict grievous pain and suffering upon his victim either for purpose of revenge, extortion, persuasion or to satisfy some sadistic impulse (*People* v. *Daugherty,* 40 Cal.2d 876 [256 P.2d 911] ; *People* v. *Misquez,* 152 Cal.App.2d 471, 480 [313 P.2d 206] ). The fact of the victim's pain and suffering is not enough to establish murder by torture unless there is also evidence that the defendant possessed the intent to cause cruel suffering (*People* v. *Caldwell,* 43 Cal.2d 864 [279 P.2d 539] ). Appellant argues that there is no evidence of his intent to cause cruel suffering. ▮ When a killing is perpetrated by means of torture, the means used is conclusive evidence of malice and premeditation, and the crime is first degree murder (*People* v. *Turville,* 51 Cal.2d 620 [335 P.2d 678] ). ▮ We think the above summary of the evidence clearly indicates that the evidence is more than ample to sustain the verdict. It is not necessary to set forth the sordid events and appellant's participation therein in any greater detail. This is as clear a case of murder by torture as can be found in the annals of law.

▮ Appellant next argues that at the time of the offense, he was so intoxicated that he could not form the requisite intent, and that the jury was improperly instructed on the effect of his alleged intoxication. There is no merit in this argument. Appellant himself testified that he had been drinking heavily and was full of Port wine, but knew what he was doing and what he said. He remembered that there was an incident with the dog, and also when Mary and Senior left. His wife testified that although appellant was drunk, he could

stand, walk and talk. Mary testified that everyone was not intoxicated on the afternoon in question. Senior did not testify at the trial. The only other witness who supported appellant's theory of alleged intoxication was Opal Fanning. The jury was properly instructed in the language of section 22 of the Penal Code and *People* v. *Caldwell, supra* (*People* v. *Gorshen,* 51 Cal.2d 716 [336 P.2d 492]). In view of the conflicting evidence, the jury's resolution of the effect of the alleged intoxication on appellant's ability to form the requisite intent is conclusive on appeal (*People* v. *Deloney,* 41 Cal.2d 832 [264 P.2d 532]).

Appellant next argues that he was provoked to "hot passion" against Ackley so that the offense could have been voluntary manslaughter and the trial court erred in failing to instruct the jury on voluntary manslaughter. We cannot agree. The only provocation occurred long before the victim was brought to appellant's home on February 26. The trial court, therefore. properly concluded that the only kind of manslaughter applicable to the case was involuntary manslaughter and so instructed the jury.

Appellant also argues that the jury had to base its implied finding of premeditation on conjecture as they found Senior guilty of only second degree murder and there is no rational distinction between Senior's acts and appellant's. In the light of the facts presented, it is obvious that appellant was the chief instigator and perpetrator of the events which culminated in the death of Ackley. Nor is it in any way unusual or improper for a jury to find codefendants in a joint trial guilty of different offenses or different degrees of the same offense (*People* v. *Turville,* 51 Cal.2d 620, 638 [335 P.2d 678] ; *People* v. *Blackwood,* 35 Cal.App.2d 728 [96 P.2d 982]).

The second major argument on appeal is that the trial court erred to the prejudice of appellant by allowing the district attorney to improperly impeach his own witness, James Fanning. James Fanning was called as a witness but could not remember anything, as he was drunk all day. The district attorney then asked if Fanning remembered a conversation with certain police inspectors on March 12, 1959. Fanning replied that he did not remember as he was also drunk that day. Thereafter, the district attorney attempted to refresh Fanning's recollection with a statement made to the police inspectors. Fanning also could not remember making this statement. Mrs. Fanning then testified that on the afternoon of February 26, appellant and Senior visited her at her

home at 331 Valencia Street and told her of their intentions to take care of Ackley.

Appellant argues that this was improper impeachment, as the witness, James Fanning, only testified on direct examination that he did not remember any conversation with appellant and the People's case was not "damaged." Appellant bases his argument on *People* v. *Newson,* 37 Cal.2d 34 [230 P.2d 618]. ■ However, it is now clear that the *Newson* case did not lay down a rule that all negative answers are harmless, and it is necessary to determine on the facts of each case whether the testimony of the witness sought to be impeached has actually damaged the party calling him (*People* v. *LeBeau,* 39 Cal.2d 146 [245 P.2d 302].) ■ We think that in the instant case, the prosecution suffered a loss of position when the witness Fanning stated that he could not remember his February 26 conversation with appellant and Senior (*People* v. *Spinosa,* 115 Cal.App.2d 659. 667 [252 P.2d 409]). ■ To permit impeachment of one's own witness. three elements must exist: (1) damage to the party calling the witness; (2) materiality of the evidence; and (3) surprise at his present testimony (*People* v. *Spinosa, supra,* at p. 665; *People* v. *LeBeau, supra,* at p. 148). ■ When a witness testifies that he does not remember making his previous statements, it is competent to prove them for the purpose of impeachment (*People* v. *Roach,* 148 Cal.App.2d 364, 370 [306 P.2d 523]; *People* v. *Bjornsen,* 79 Cal.App.2d 519, 535 [180 P.2d 443]; *People* v. *Gibson,* 154 Cal.App.2d 67, 72 [315 P.2d 442]). ■ Here, the district attorney merely laid a foundation for impeachment. The actual impeachment occurred when the next witness, Mrs. Fanning, testified that appellant was at her home on the afternoon in question and told her of their plans.

We note that the intervening years have not impugned the authority of the cases cited in the prior opinion on the first two claims of error raised.

■ We turn then to the contention that appellant was denied due process because of the introduction into evidence of the extrajudicial tape recording of a statement made by the codefendant Senior prior to his arrest. In the statement, Senior admitted that he knew Ackley, appellant and Mary Maribo and heard Mary's accusations against Ackley. Senior also admitted slapping Ackley on the day in question but denied participating in the more serious subsequent events at appellant's home. Ackley was alive and talking that evening when

Senior left, as well as the next morning when Senior returned to appellant's home.

The record indicates that the tape was heard by the jury and by stipulation, transcribed in the reporter's transcript. The district attorney indicated that the statement was offered only against Senior and would not be admitted against appellant, who was not present when it was taken. Both defense counsel objected that the statement was a self-serving declaration on behalf of Senior and contained no admission against his interest. The objections were overruled on the basis of *People* v. *Wojahn,* 169 Cal.App.2d 135 [337 P.2d 192], which approved the transcription procedure here used. Before the tape was played and again when the case was submitted to the jury, the court instructed that the statement could be considered only against Senior.

We are now directed to reconsider appellant's claim of reversible error based on the admission of Senior's statement in light of *Bruton* v. *United States,* 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], and *Roberts* v. *Russell,* 392 U.S. 293 [20 L.Ed.2d 1100, 88 S.Ct. 1921]. *Bruton* held that the admission of the inculpating statement or confession of a codefendant posed a substantial hazard to a defendant's Sixth Amendment rights of confrontation and cross-examination that could not be cured by limiting instructions to the jury. In *Roberts,* the court held that *Bruton* corrected a serious flaw in the fact-finding process at trial and, therefore, was retroactively applicable to both federal and state prosecutions.

As under these recent holdings the admission of Senior's statement was an error of federal constitutional dimension, we must undertake an assessment of prejudice in light of the standard enunciated in *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. That standard required reversal if, upon an examination of the entire record, it appears reasonably possible that the error might have materially influenced the jury in arriving at its verdict, and the error must be considered harmless if the likelihood of material influence is not within the realm of reasonable possibility (*People* v. *Haston,* 69 Cal.2d 233, 252 [70 Cal. Rptr. 419, 444 P.2d 91]; *People* v. *Coffey,* 67 Cal.2d 204, 220 [60 Cal.Rptr. 457, 430 P.2d 15]).

In view of all the evidence, Senior's statement here was minor and merely corroborative of some of the details of the murder. Appellant, his wife, and Mary all admitted being with the victim on the afternoon and evening of February

26. All testified that appellant had indicated his intent to get Ackley because of Ackley's comment about appellant's wife. all participated to some extent in the events at the Pickens home. The only variations in their testimony related to the extent of their participation. Given the overwhelming amount of evidence concerning the events that led to the death of the victim and appellant's participation therein, we conclude that there is not even a reasonable possibility that the erroneous introduction of Senior's statement might have materially influenced the jury in arriving at its verdict (*Chapman* v. *California, supra*).

Affirmed.

Shoemaker, P. J., and Agee, J., concurred.